JUDGE ROBERTSON
delivered the following opinion, in which
JUDGE PETERS concurred:
Only a few days after the intermarriage of Leslie O. Graves and Mary E. Searles, both born and reared in Lexington, Kentucky, he procured for her benefit from the appellant, a life insurance company of St. Louis, Missouri, a policy insuring his life to the amount of five thousand dollars to her use, on several prescribed conditions, among which are the following: “If the said person whose life is insured shall clie by his oion hand, by delirium tremens, or the use of opium, or in consequence of a duel, or the laws of any nation, state, or province, that then, in such case, the policy shall be null and void.”
All these terms alike, being eyusdem generis, imply a death as the natural consequence of some voluntary act *270 of the assured which he had the moral power to avoid, and against which therefore the underwriters would not insure, and could not, consistently with public policy, have insured.
The inevitable act of an insane man, who in that respect is morally dead, is not, in the sense of the law or of the recited conditions, his voluntary act. An insane act is no more voluntary than any act constrained by extraneous force would be the voluntary and responsible act of the victim of accident or resistless power over his will. The object of the policy was to insure against involuntary death without the fault of the assured.
Graves was insured as a free moral agent, who, as such, might voluntarily so act as to increase the contemplated risk. It was prudent and just therefore to provide in the policy against any extraordinary perils to life resulting from the voluntary conduct of the assured, who, by necessary implication, undertook to abstain from any act jeopardizing his life beyond the ordinary accidents to which it was liable without his fault. Nor this precautionary condition there was a reasonable and consistent motive. But there was no such motive for avoiding the policy for inevitable suicide, which, whether accidental or otherwise against the free will of a rational mind, is essentially in the category of natural death froih ordinary causes, as indisputably insured against. Mental insanity is disease; and the policy insures against death by disease of any sort which ordinary prudence could not avoid. Death by insanity is death by disease, and is so considered in medical jurisprudence.
'Why except from the insurance death by insanity? Did not the parties contemplate death by any disease not avoidable by prudent and proper conduct? The underwriters took all such risk and no other; and to prevent *271 fraud or imposture excepted death by opium or by delirium tremens, and other causes which the assured could avoid, and ought to avoid, and therefore impliedly undertook to avoid. Death “by his own hand” is in the same class of causes for avoidance, and means the same character of avoidable death. The mind is the man, and the conditions of avoidance all alike contemplate a rational mind and presiding will. Death by opium therefore means not the accidental or involuntary but the rational and voluntary use of opium; death by delirium tremens imports death by voluntary and habitual drunkenness; and death by dueling is a voluntary act: all of which deaths might and ought to have been avoided. So, for the same reason, death “by his own hand” means suicide, not accidental or coerced, but premeditated by a sound mind and perpetrated by a free will; and a voluntary act of the will necessarily implies liberty and self-control; and consequently the act of an insane mind or subjugated will is not voluntary. It is not the act of the man, but of some power above him, and which his will can not elude or control.
The condition as to death “by his own hand” reasonably imports therefore that if the insured should commit suicide voluntarily when he had the moral power to forbear, just as he might commit it by the habitual use of opium or intoxicating liquors, the policy should be thereby avoided. The death, in each case alike, must be the voluntary act of a sane mind and a responsible will. As policies are peculiar in their style, and not easily intelligible by the common mind, this language should, in cases of doubt, be most favorably construed for the benefit of the assured. This is enough for this case.
There is some apparent conflict in the adjudged cases on the construction of just such a condition of avoidance in a life policy as that which we are considering; but there *272 is no very essential diversity in principle; all that is judicial, with perhaps one exception, concurring in- the principle that to avoid the policy the death must be tilvoluntary.” And no mind, itself rational, can contemplate any act as voluntary unless it be the offspring of a free volition, unconstrained by inevitable duress, physical or moral.
In the case of Dean v. American Insurance Company, 4 Allen’s Reports, the Supreme Court of Massachusetts, in lan elaborate, self-contradictory, and inconclusive opinion, (seemed inclined to construe the words “if he died by his 'own hand” as intended to mean self-destruction, however or by whomsoever effected. But, to escape the absurdity of including death by accident, the opinion concludes that the avoiding act must be voluntary.
This argument is surely a felo de se, or must concede that all suicide, however effected, is voluntary. And this is a petitio principii, and begs the question. This case therefore, though apparently the strongest against us, is, when its metaphysical labyrinth is threaded, corroborative of our conclusion that the avoiding act must be voluntary. This interpretation of the decision can be evaded only by the assumption that it uses the word “ voluntaiy ” in some recondite sense, inconsistent with its legal and metaphysical import.
In Hartman v. Keystone Insurance Company, 9. Harris, 479, the Supremo Court of Pennsylvania say that the words “die by his own hand,” standing alone, “mean any sort of suicide.” This -has no essential bearing on the question we are considering, and noscitur a soeiis, can not be disregarded. But several American cases ably and, as we think, conclusively sustain our construction.
In Breasted v. The Farmers Loan and Trust Company, 4 Hill, 74, the Supreme Court of New York, in a powerful *273 opinion by Nelson, now of the United States Supreme Court, adjudged that “suicide” and “died by his own hands,” as generally used in policies, were synonymous, and that “ die by his own hands ” means voluntary self-destruction by the free will of a sane man; and said “self-destruction by a fellow-being bereft of reason can with no more propriety be ascribed to the act of his own hand than to the deadly instrument that may have been used for the purpose.” “The drowning of Comport was no more his act in the sense of the law than if he had been impelled by irresistible physical force.” “Self-slaughter by an insane man or a lunatic is not an act of suicide within the meaning of the law.” (4 Black. Com. 189; 1 Hale’s P. C. 411.)
In that case therefore the court decided that the policy was not avoided, though the assured died by his own hand, but without a self-controlling will to avoid the act. And on an appeal to the court of appeals that judgment was affirmed by a more argumentative opinion by Willard (Selden’s Reports, 803), in which it was adjudged that “suicide” and death “by his own hand” were synonymous in policies. And the court said that in each the act must be intentional, and therefore criminal, which could not be the case if the mind was constrained by moral or physical duress; and said also, “Can it make any difference whether this coercion come from the hand of man or the visitation of Providence?”
And the same principle is recognized and enforced by masterly argument by the Supreme Court of Maine, in the case of Easterbrook v. The Union Mutual Life Insurance Company, 54 Maine Rep. 225, in which the court cite and criticise the British case of Barrodaile v. Hunter, 5 Man. & Gra. 639, and that of Clift v. Schwabe, 3 Man. & Gra. 437.
*274 Now, in^the case of Borradaile v. Hunter, a majority of the court, Chief Justice Tindal and others dissenting, decided that the policy was avoided by the self-destruction of the assured, because the jury found that the act was voluntary; thus implying that, unless the act was voluntary, the policy had not been avoided. And this, so far, is coincident with our opinion. But that court seemed to think that knowledge of right and wrong may make an insane act voluntary. This inconsistency of the past generation on the phenomena of insanity is exploded by the advancing science of this more rectified age. Moreover, it seems that not only Tindal, but Maule, Pollock, Cresswell, Tenterden, and other eminent jurists of England, disapproved the inconsistent doctrine in Borradaile v. Hunter and Clift v. Schwabe, which followed it, and that Lord St. Leonard says, in a note to Bunyan on Insurance, 75, “Sed quere the decision?” Those cases are therefore not full and unquestioned authority even in England, except so far as they support our conclusion that the act can not avoid the policy unless it be voluntary. And who can doubt what, in its legal sense, “voluntary" is?
Hence, referring to those British cases as coincident in reason with Breasted v. Farmers Loan and Trust Company, as reported in Hill and Selden, Phillips on Insurance, section 895, says, in effect, that any mental derangement sufficient to exonerate a party from a contract would render a person incapable of occasioning the forfeiture of such a policy as this.
We may now conclude that principle, reason, and authority, all concurring, show that an insane act is not voluntary, and that to avoid the policy in this case the act of self-destruction must have been voluntary. Was Graves’s death a voluntary act? This is the vital question for solution by the law and the facts.
*275 Every self-destroyer literally dies “ by bis own hand;” but technical suicide implies a sane and controlling mine].. All this the parties to the policy must be presumed to have understood, and consequently to have contemplated, by the words “if he died by his own hand,” the death of a sane man by his own voluntary act, and not by accident or the merely mechanical hand of a maniac.
In about four months after the date of the policy the assured was shot in the head about ten o’clock on the night of the 17th of April, 1867, and immediately after the report of the fatal shot was found lying dead and alone in the dark, in his livery-stable, near a pistol which he had only a few moments before unfortunately procured from a friend; and though the contrary has been assumed, yet the circumstances will allow scarcely a doubt that he died “by his own hand.”
To recover on the policy the widow of the assured brought this action, and averred that the fatal shot was the involuntary offspring of a momentary paroxysm of moral insanity, which subjugated his will, and impelled the homicide beyond the power of self-control or successful resistance.
The appellant demurred, and, being overruled, traversed those allegations; and on that substantial issue the jury' found for the appellee, and the judge rendered judgment against the appellant, now sought to be reversed.
If the death was not an act of free volition, the unconstrained will of a sane and self-poised mind, the appellant is responsible; otherwise not.
According to matured philosophy, and the corroborating authority of elementary writers, such as Prichard and Esquirol and Ray and Taylor, and of many modern adjudications, both British and American, there may be moral as well as intellectual insanity, and essentially con *276 tradistinguised from it. When, as often happens from congenital malorganization or supervenient disturbance of the normal condition of a sound mind in a sound body, the senses present false images which, accredited necessarily by the deluded victim as intuitive certainties, no reasoning or proof can rectify the illusion of a mind in such abnormal condition, and consequently, as no punitary sanction can prevent the effects of such insane delusion, there is no legal responsibility. This is called intellectual insanity.
But, while the senses are apparently sound and true, the affections may be perverted, or the moral sentiments unhinged in such a degree as to subjugate the will to some morbid appetite or ungovernable passion, and thus precipitates against the will insane but conscious wrong. This is contradistinctively called moral insanity. Such are the forms of monomania entitled kleptomania, pyromania, nymphomania, homicidal mania, etc., now well-defined and recognized as irresponsible insanity.
Whether and how far these two distinctive forms of insanity run into and sympathize with each. other is unknown. But generally the one is apparently untinged by the other, and in moral dethronement by insane passion there may be no delusion, but the will is overwhelmed by delirious passion, which it can neither stifle nor successfully resist. Smith v. The Commonwealth, 1 Duvall, is Kentucky authority supporting this theory.
The appellee-rests her case on the plea that her husband’s suicide was an act of moral insanity; and her counsel assume that all suicide is an insane act, or prima facie evidence of insanity in .some phase. All this is controverted by the appellant; and here lies the issue discussed and tried.
On the question whether a sane mind can commit voluntary suicide there has been some conflict of opinion. *277 Some medico-jurists insist that suicide is necessarily an insane act; others that it is only prima fade evidence of insanity.
The first hypothesis has been generally discredited, and the latter much doubted, in all time and every forum, ever since the suicides of Themistocles, Demosthenes, Hannibal, and Cato of Htica. "Without faith in a future state of retribution, these historic men seemed, each and all, to prefer, on rational calculation, annihilation to hopeless torture or degradation. Even assurance of immortality might not always stay the voluntary hand of the reasoning suicide. Martyrdom for faith or principle or opinion, though not a positive act of suicide, is yet virtually self-immolation on the altar of truth and of posthumous fame. And many such self-sacrifices illustrate the middle ages, and even subsequent periods of the earth’s history, without the imputation or suspicion of impelling insanity. Still self-destruction is so rare and awful as, in itself and by itself, to imply insanity, in the absence of proof of motive or predisposing causes. Such are our judicial theories on this occult subject.
Without elaboration of the elements of physiology or psychology, or analysis of Ray or Esquirol or Prichard or Taylor, all substantially concurrent, or of British and American adjudications, in some respects conflicting, we are content with the conclusion that the foregoing outline sufficiently defines the law of this case.
In giving and refusing instructions on the trial, the circuit judge, with one exception, substantially applied the law as thus defined. If a paroxysm of moral insanity caused the death of the assured, the suicidal act was involuntary, and at the instant unavoidable, even if he then knew its illegality and all its consequences; for such knowledge, as before suggested, is consistent with that *278 form of insanity, and therefore the court did not err in refusing to instruct the jury otherwise, and of which the appellant most complains. But instruction number three, given for appellee, may be so interpreted as to be misleading and erroneous, and was therefore improperly given. This is the exception before suggested.
The evidence of insanity is conflicting. The assured ivas not only blessed with a loved and loving young wife, but with prosperity in business, without any disclosed cause to be tired of life. Evidence of a rumor that, on the night preceding his death, he had burned his brother’s rival livery-stable was admitted. That accusation, if he knew it, might have operated as a powerful motive to escape by suicide the agony of overwhelming disgrace; and therefore the admission of the testimony might not have been prejudicial to the appellant, and especially as during the evening of the intervening day L. C. Graves took several copious and solitary draughts of intoxicating liquors, as if to drown distress and give him a false and reckless courage for a desperate deed, which calm and sober he could not perpetrate. But as we can not know the effect of that testimony on the mind of the jury, we adjudge the evidence incompetent unless he had heard the rumor. It also appears that only a few moments before the report of the pistol he by much importunity procured the weapon from a friend, and was drunk. These facts conduce to the conclusion that the suicide was voluntary and premeditated, and was not the inevitable result of moral insanity.
On the other hand; his apparent felicity in his domestic relations and prospects, the monstrous character of the act itself, and the want of certain proof of any strong motive for it, fortify the prima facie presumption of insanity, which is still more strengthened by the testimony *279 of Doctors Chipley and Skillman, -who both, after hearing the evidence, concurred in the belief that, if Graves shot himself, the act was the offspring of moral mania.
The probabilities are so nearly balanced that the preponderance would not allow this court to set aside a verdict either way for want of evidence to support it. But the resisted admission of the opinions of many unprofessional witnesses expressed on a long hypothetical question as to whether they thought that, under all the circumstances, Graves if sane would have shot himself, was a substantial error, prejudicial to the appellant.
For that error, the error in instruction number three, and the error in admitting evidence of the monomania, the judgment is reversed, and the cause remanded for a new trial.
CHIEF JUSTICE WILLIAMS
delivered the following separate opinion,
in which JUDGE HARDIN concurred.
January 7, 1867, Leslie O. Graves, appellee’s husband, procured from appellant a policy of insurance on his life, in his wife’s name and for her benefit, which contains a proviso with six several paragraphs, the fourth being as follows: *280 writing; or if he shall die by his own hand, by delirium tremens, or the use of opium, or in consequence of a duel, or the violation of the law of any nation, state, or province; . . . this policy shall be void.”
*279 “4. If the said person whose life is hereby insured shall pass beyond the above-described limits; or shall be personally engaged in blasting, mining, submarine operations, or the production of highly inflammable or explosive substances; or in working or managing a steam-engine in any capacity; or as a mariner, engineer, fireman, conductor, or laborer in any capacity upon service on any sea, sound, inlet, river, lake, or railroad; or shall enter any military or naval service whatsoever (the militia when not in active service excepted), without the consent of this company in each or either of the foregoing cases, previously given in
*280 "Without the least sign of previous mental or moral insanity, so far as the evidence in this case exhibits, and after stimulating himself freely with ardent spirits, as though to raise his animal courage to an adequate degree for the act, and after importuning a friend to loan him his pistol, which the friend, though he at, first declined, did on being pressed, and promised a return within a very short time, Leslie C. Graves shot himself on the evening of April 17, 1867, about ten o’clock, and 'died instantly and within less than a half hour after obtaining the pistol.
The only possible clue to account for any disposition to take his own life being a current rumor about the city of his residence (Lexington) that through his instrumentality his brother’s rival livery-stable had but two nights before been burned; but even this is not proved, to have reached his ears.
In this suit on said policy by the wife the jury have found for her the sum stipulated — five thousand dollars— under the following, among other, instructions of the court: “ That before the jury can find for the defendant they must be satisfied from the evidence given that Leslie O. Graves, whose life is insured, intentionally destroyed it; that although the jury may be satisfied that Leslie C. Graves, whose life was insured by the defendant, committed suicide, and that when he did the act his intellect was unimpaired, and that he knew it was forbidden both by moral and human law, yet if they believe from the evidence that at the instant of the commission of the act his will was subordinated by any uncontrollable passion or *281 emotion causing him to do the act, it was an act of moral insanity, and they ought, if they so believe, to find for the plaintiff.”
And we are now asked to say that this is law. In all the vague, uncertain, intangible, and undefined theories of the most impracticable metaphysician on psychology and moral insanity, no court of last resort in England or America, so far as has been brought to our knowledge, ever before announced such a startling, irresponsible, and dangerous proposition of law. For if this be law, then no longer is there responsibility for homicide, unless it be perpetrated in calm, cool, considerate condition of mind. "What is this proposition when compressed into a single sentence ? That if his “ intellect was unimpaired, and that he knew it was forbidden both by moral and human law,” yet if at “the instant of the act his will was subordinated by any uncontrollable passion or emotion causing him to do the act, it was moral insanity, and they ought to find for the plaintiff.” Concede that it was through either passion or mortification, or fear of disgrace because of this rumor, and instead of killing himself he had killed his brother, or some one else whom he suspected of being connected with the rumor, should this transport of passion or mortification or fear of disgrace have exempted him from criminal responsibility ? If so, then indeed the more violent the passion and desperate the deed the more secure from punishment will be the perpetrator of homicide or other crime. Had Graves killed another under the circumstances developed in this case, we should enter our most solemn protest against his exoneration from responsibility. But it is not necessary to put this case on any such grounds, for this is a civil suit, founded on a civil contract.
The doctrine of moral insanity, ever dangerous as it is to the security of the citizen’s life, and pregnant as it is *282 with evils to society, has but little or no application to this case. Too uncertain and intangible for the practical consideration of juries, and unsafe in the hands of even the most learned and astute jurist, it should never be resorted to for exemption from responsibility save on the most irrefragible evidence, developing unquestionable testimony of that morbid or diseased condition of tbe affections or passions so as to control and overpower or subordinate the will before the act complained of; for if the act is to be evidence of moral insanity for the suicide, so it will be for the homicide, the parricide, and the seducer and the ravisher.
But as the general covenants of the policy assured against all deaths by disease, whether of body or mind, what did the parties mean by inserting the proviso that the company was not to be responsible “if he shall die by his own hands V’ These are important and pregnant words, full of meaning.
In natural and common parlance there would be but little difficulty in this determination, for they should have a rational construction, to be derived from the whole contract and the objects of the parties as therein evidenced. But the refinements of astute and metaphysical minds have refined away this in exploring the mazy, dark, and limitless region of psychology and moral insanity, and herein lies the difficulty.
The party did not intend to insure against self-destruction; yet, says the refined metaphysician, this means a voluntary self-destruction, and if the party was morally or mentally insane he did not destroy himself, and that the act of self-destruction is evidence in itself of such moral insanity. So the act of taking his own life disproves the self-destruction. "Was there ever a more self-destroying argument or theory? And if this theory be *283 true that the act of suicide evidences insanity, either moral or mental, does this not itself establish the fact that it was against such death that the company refused to insure, and so provided for its exemption from the operation of the general covenants of the policy?
If moral insanity, when the mind is left unimpaired, is to be substituted for disease, to what purpose were the words used ? What kind of self-destruction did they provide against? For the astute metaphysicians who testified in this case gave it as their opinion that in a Christian country no sane man would commit suicide, and so testified nearly every other witness, and they were many, who were called to the point; and so, it is presumed, found the jury, for this is the sole act of insanity proved or attempted to be proved in the case.
Now this actual, practical reduciio ad absurdum illustrates the uncertain and intangible impalpability of such a theory. Here the insurance company does not insure against self-destruction. This, says the theorist, does not embrace an act of moral or mental insanity, and that the act of self-destruction evidences, in itself, such moral insanity; the inevitable logical result therefore is that as self-destruction testifies to moral insanity, which is not embraced in the proviso, so self-destruction is not embraced in the words if he die by his own hands. If this be so, what do they mean? For there they stand as part of the covenant, aud as a qualification to the previously used general terms of responsibility by the company. This in effect, and to all legal and practical purpose, nullifies and abolishes the proviso, and renders it a mere brutum f ulmén, a senseless, imbecile provision.
If then we would escape this illogical absurdity, and attach any sensible meaning to these words, and give them any effective operation, we must find a more practical *284 solution than the theory of moral insanity has or can present to us.
It is remarkable that all the decisions brought or which have come to our view, have been made upon strongly developed and distinctly marked cases of prior intellectual insanity, and do not embrace a single case of moral insanity; yet there was a divided court, whether of England or the American states, save alone that of Massachusetts, in the great case of Dean et al. v. American Life Insurance Company, 4 Allen, 96, wherein the reasoning of Chief Justice Bigelow was so clear, strong, and palpable, and presented such a clear, practical point in such cases, that it unanimously carried that court of six judges, deservedly distinguished for their learning and ability.
It is no argument to say that the literal meaning of those words would avoid the policy on every self-destruction, however this might be produced, whether by the merest casualty, or by the raving maniac who knew not right from wrong nor life from death. Such a meaning has not been contended for by the insurer nor its attorney, nor justified by the opinion of any judge; but a reasonable and fair construction is sought to be placed on them, as derived from the whole contract and the objects of the parties as therein manifested.
Borradaile v. Hunter, decided in 1843, is a leading English case (44 English Common Law R. 336), in which the jury found specially “that Mr. Borradaile voluntarily threw himself from the bridge (over the Thames) with the intention of destroying his life; but at the time of committing the act he was not capable of judging between right and wrong.”
There were many acts of insanity before the suicide proved; besides, he was a divine, and doubtless well in *285 strueted in moral and future responsibility, which greatly strengthened the other evidence of insanity; yet Mr. Justice Erskine entered the verdict for the defendant; but afterward, upon rule to set it aside, the case came before a superior court, consisting of the Lord Chief Justice Tindal, and Justices Maulé, Erskine, Caltman, and Cresswell, the Lord Chief Justice alone dissenting.
Erskine said: ‘£ Looking simply at that branch of the proviso upon which the issue was raised, it seems to me that the only qualification that a liberal interpretation of the words with reference to the nature of the contract requires is that the act of self-destruction should be the voluntary and willful act of the man, having at the time sufficient powers of mind and reason to understand the physical nature and consequences of such act, and having at the time a purpose and intention to cause his own death by the act; and that the question whether at the time he was capable of understanding and appreciating the moral nature and quality of his purpose is not relevant to the inquiry, further than as it might help to illustrate the extent of his capacity to understand the physical character of the act itself.” The language of the English policy was identical with the one under, consideration, and judgment was entered for the defendant.
Three years subsequently another English case came under review of her courts; to wit, Clift v. Schwabe, 54 English Common Law K,. 437. This, however, was upon a policy providing that it should be void if the person whose life was insured should commit suicide. In this case it was held by five to two of the judges that the word suicide must be taken in its common acceptation, not being a word of art to which a legal technical meaning attaches, but in ordinary parlance means one who had purposely killed himself.
*286 The court, upon solemn argument and due consideration, again affirmed the principles announced in Borradaile v. Hunter, and held the policy void because the said Schwabe, whose life was insured, committed suicide by taking sulphuric acid with the intent to kill himself, though then of unsound mind. The reasoning in this was similar to the other case, since which time the law has been regarded as so settled in England.
In 1843, the Senate of New York, sitting as a court of errors, in Breasted v. Farmers Loan and Trust Company, 4 Hill, 74, held that “suicide involves the deliberate termination of one’s existence while in possession and enjoyment of his mental faculties. Self-slaughter by an insane man or a lunatic is not an act of suicide within the meaning of law.”
But the evidence or character of Comfort’s insanity is not given in the short, unphilosophic, and weak argumentation of this political body, though written by its chief justice. The same case, however, went up to the Appellate Court from the Supreme Court of New York in 1853 (4 Selden, 303), and it appears therein “that the assured threw" himself into the Hudson River from the steamboat Erie, while insane, for the purpose of drowning himself, not being capable at the time of distinguishing between right and wrong,” as found by the referees.
Here was evidence of insanity, before he perpetrated the deed, to such an extent as to destroy his knowledge and power to discriminate between right and wrong; and what was said in the opinion of the court, much more argumentative than the other, must be taken in reference to such character of mental insanity. And while a majority of the court evidently felt the cogency of the reasoning and authority of the English courts, still it drew a distinction between the facts, insisting that in the English *287 cases the suicide had acted voluntarily, but uot so with Comfort; so that they were deciding in a case where no volition had been exercised, nor was there power to distinguish between right and wrong, which makes out a ease of bad intellectual lunacy.; yet even here was a nearly equally divided court, or a majority of four against a minority of three on such a case.
The next case is that of Easterbrook v. The Union Mutual Life Insurance Company, 54 Maine, 224, in which the Supreme Court of Maine, by a divided court of four to one, upon a policy identical in language to the one in this case, and upon the finding of the jury “that the self-destruction was the result of a blind and irresistible impulse over which the will had no control, and that the self-destruction was not an act of volition,” held that the policy was not avoided by such act committed by one laboring under such insanity.
But in the case of Hartman v. Keystone Insurance Company, 21 Penn. 479, the Supreme Court of Pennsylvania, by Chief Justice Black, held that “the words die by his own hand must be disconnected from those which follow; standing alone they mean any sort of suicide;” one judge dissenting, one absent, and three concurring.
In Dean v. American Mutual Life Insurance Company, 4 Allen, 96, the Supreme Court of Massachusetts, by unanimity of the six judges, held that a policy containing the words in the proviso that if the assured “ shall die by his own hand” it is to be void, means to exclude risks of {‘ the destruction of life by the voluntary and intentional act of the party assured.” The court said: “ The moral responsibility for the act does not affect the nature of the hazard. The object is'to guard against loss arising from a particular mode of death. The causa causus, the motive or influence which guided or controlled the will of the *288 party committing the act, are immaterial as affecting the risk which the insurers intended to except from the policy. This view is entirely consistent with the nature of the contract. It is the ordinary case of an exception of a risk which would otherwise fall within the general terms of the policy. These comprehend death by disease, either of the body or brain, from whatever cause arising. The proriso exempts the insurers from liability when life is destroyed by the act of the party insured, although it may be distinctly traced as the result of a diseased mind. It may well be that insurers would be willing to assume the risk of the results flowing from all diseases of the body, producing death by the operation of physical causes, and yet deem it expedient to avoid the hazards of mental disorders in its effects on the will of the assured, whether it originated in bodily disease, or arose from external circumstances, or was produced by a want of moral and religious culture.”
The court again said the question is not how far can the literal meaning of the words be extended, but what is á reasonable limitation and qualification of them, having-regard to the nature of the contract and the objects intended to be accomplished by it?
Applying this principle to the proviso, it would seem to be reasonable to hold that they were intended to except from the policy all cases of death caused by the voluntary act of the assured, when his deed of self-destruction was the result of intention, by a person knowing the nature and consequences of the act, although it may have been done under an insane delusion, which rendered the party morally and legally irresponsible.
If the suicide was an act of volition, however excited or impelled, it may in a just sense be said that he died by his own hand. If the <leath was caused by accident, *289 by superior and overwhelming force, in the madness of delirium, or under any combination of circumstances from which it may be fairly inferred that the act of self-destruction was not the result of the will, or intention of the party adapting means to the end, and contemplating the physical nature and effect of the act, then it may be justly held to be a loss not excepted within the meaning of the proviso. A party can not be said to die by his own hand, in the sense in which those words are used in the policy, whose self-destruction does not proceed from the exercise of an act of volition, but is the result of blind impulse, of mistake or accident, or of other circumstances over which the will can exercise no control.
This is the tangible, practical view of the subject, and within the comprehension of plain, sensible men, such as generally make contracts, and such as juries are generally composed of, and embraces the true philosophy of the proviso and the reasons for its insertion, rendering it intelligible and valuable.
It is remarkable that every one of these cases, both in England and America, arose out of intellectual insanity— a disease often, if not universally, produced by physical derangement — evidenced before the act of self-destruction. If judges could differ in such eases — and a great majority hold that even then the insanity must be of such a degree as to preclude volition and a comprehension of the physical result of the act before it Aiould be exonerated from the operation of the proviso in the policy — could it not be rationally inferred that in a case of mere moral insanity, where the intellect was left unimpaired, with a full comprehension of the ret and physical result thereof, and studiously adapting the means to the end, that the judges would have been unanimous that the mere impulse of passion at the instant of the act, however strong and *290 overwhelming and controlling over the mind, could not rescue it from the operation of the proviso.
It never has been anticipated by any law writer known to us that 'the mere transports of passion at the time the fatal deed is done, when the mind remains unimpaired and in the exercise of its intellectual faculties, however violent and overwhelming, shall exonerate from even criminal responsibility, much less to avoid civil contracts. The close proximity of the words “shall die by his own hand” to words signifying criminal intent, no more indicates that such intent enters into their meaning than does their close proximity to other words importing no such intent, but an innocent one, show that they should be construed to mean irresponsible, innocent action; and as these words stand in close connection with both classes of words, how shall courts determine that they are to be construed by the one rather than the other? Evidently these words, as held by Chief Justice Black in the Pennsylvania case and by other courts, must be construed by themselves, and in their common, natural signification held to mean what the parties understand, as derived from the whole contract, its nature and objects.
The opinions of witnesses, not founded on science, but as a mere theory of morals or ethics, whether given by professional or unprofessional men, are wholly inadmissible as evidence. Hence the opinion of even physicians that no sane man in a Christian country would commit suicide, not being founded on the science or phenomena of the mind, but rather a theory of morale, religion, and future responsibility, is not evidence.
Nor should the court have permitted the so recent rumor about the city to be proved over the defendant’s objections, unless it had been carried home to the knowledge of deceased. The sanity of the suicide, like that of *291 the homicide, is legally presumed, and the evidence of insanity must be sufficiently potent to overcome both this legal presumption and the evidence of sanity, and establish to the satisfaction of the jury insanity. (Grayham v. Commonwealth, 16 B. Mon. 587; Kriel v. Commonwealth, 5 Bush, 362.) The mere prohibited act can rarely if ever do this.
It would be well on another trial to submit special facts and have a special finding of the jury, so that the court may pronounce the judgment of law upon snch finding.
Wherefore, concurring in the reversal, but not in the law as expounded by Judges Robertson and Peters, we have herein given our opinion.