OF THE

## STATE OF MISSOURI

AT THE

### APRIL TERM, 1900.

*(Continued from Volume 156.)*

SCHIERBAUM et al. v. SCHEMME et al., Appellants.

**Division One, June 12, 1900.**

1. **Will**: PUBLICATION: ATTESTATION. A writing purporting to be the will of S having been read over to him while he and two persons named therein as executors were seated together at a table, S said "that will do, that is right," signed his name to the paper and passed it on to his companions, who in turn subscribed their names as witnesses. The paper was then handed back to S., who sealed it up in an envelope and gave it to a bystander for safekeeping. *Held,* that this constituted a sufficient publication of the writing as the will of S., and that the witnesses signed at his request, notwithstanding he did not expressly declare the paper to be his will, and did not verbally ask the witnesses to sign it.

2. ———: MENTAL CAPACITY: INSTRUCTION. Where the subscribing witnesses to a will testify that the testator was of sound mind at the time of its execution, and contestants offer no substantial evidence in support of their contention to the contrary, the trial court should withdraw the issue of mental incapacity from the jury, by a peremptory instruction.

3. ———: FRAUD: BURDEN OF PROOF. The burden of proving that a will formally executed by a testator of sound mind, was procured by fraud, is upon the contestant. And this burden is not shifted by reason of the fact that the will unjustly discriminates in favor of one and against another of the testator's children.

4. ———: EVIDENCE: DECLARATION OF TESTATOR. Upon the issue of fraud and undue influence in the procurement of a will, declarations of the testator, after making the will, concerning the causes which induced him to make it, are incompetent, and should be rejected as hearsay.

5. ———: ———: ADMISSION OF DEVISEE. Admissions made by one devisee can not be given in evidence against another devisee claiming under the same will. Authorities reviewed. (*Armstrong v. Farrar, 8 Mo. 627, overruled.*)

6. Practice: OBJECTION TO EACH WITNESS'S TESTIMONY. Where a party has seasonably objected to evidence of a certain character by one witness and his objections are overruled, he is not required to repeat his objection when testimony of the same kind by another witness is offered.

Appeal from Lincoln Circuit Court.—*Hon. E. M. Hughes,* Judge.

REVERSED AND REMANDED (*with directions*).

*Norton, Avery & Young* and *J. W. Powell,* for appellants.

(1) The will was properly executed. Mays v. Mays, 114 Mo. 536; Berberret v. Berberret, 131 Mo. 399. (2) There was no evidence sufficient to show that the testator was of unsound mind or not capable of making a will at the time, and instruction No. 1 asked by the defendants to this effect should have been given. Harvey v. Sullens, 56 Mo. 372; Young v. Ridenbaugh, 67 Mo. 574; Norton v. Paxton, 110 Mo. 456; Maddox v. Maddox, 114 Mo. 35; Martin v. Baker, 135 Mo. 495; .Jackson v. Hardin, 83 Mo. 175; Couch v. Gentry, 113 Mo. 248; Thompson v. Ish, 99 Mo. 160; McFadin v. Catron, 120 Mo. 252. (3) There was no

legal evidence showing that the will was the result of undue influence exercised by George Schemme, and instruction No. 2 asked by defendants to this effect should have been given. Gordon v. Burris, 141 Mo. 602; Doherty v. Gilmore, 136 Mo. 414; Maddox v. Maddox, 114 Mo. 35; Rankin v. Rankin, 61 Mo. 295; Thomas v. Stump, 62 Mo. 275; Morton v. Heidorn, 135 Mo. 608; Carl v. Gable, 120 Mo. 283; McFadin v. Catron, 120 Mo. 252; Tingley v. Cowgill, 48 Mo. 291; Sunderland v. Hord, 13 Mo. App. 232, affirmed, 84 Mo. 293. (4) The court erred in admission of testimony, especially that given by Mrs. Schierbaum and Mr. Eckelmier, of the conversations happening on Wednesday after the will was made, with the testator. Gordon v. Burris, 14 Mo. 602; Doherty v. Gilmore, 136 Mo. 414; Walton v. Kendrick, 122 Mo. 518; Norton v. Paxton, 110 Mo. 456; Thompson v. Ish, 99 Mo. 160; Meyers v. Hanger, 98 Mo. 433; Gibson v. Gibson, 24 Mo. 234.

*D. P. Dyer* and *Martin & Woodfolk* and *Geo. T. Dunn* for respondents.

(1) A proceeding under the statute to set aside a will is a proceeding at law and the appellate court will not reverse a judgment in such proceeding on the ground that the jury found against the weight of evidence. Lyne v. Guardian, 1 Mo. 410; Swain v. Gilbert, 3 Mo. 347; Harris v. Hays, 53 Mo. 94; Young v. Redenbaugh, 67 Mo. 574; Appleby v. Brock, 76 Mo. 314; Garland v. Smith, 127 Mo. 567; Stowe v. Stowe, 140 Mo. 594; Dexter v. Godman, 148 Mass. 421. (2) There was evidence sufficient to go to the jury upon both issues in the case and the court did not err in refusing defendants' peremptory instructions. From the bill of exceptions filed it appears that both of defendants' peremptory instructions are alike and are directed to the ca-

pacity of Schemme to make a will. The word capable as
used in these instructions would apply to the condition of
mind under undue influence as well as weakness or want of
mind, and if there was evidence of either one or the other the
court properly refused the instruction. (3) Appellants
complain of Mrs. Schierbaum's statement of what her father
said. Appellants did not object to the testimony of Eckel-
mier as stated. The testimony of Mrs. Schierbaum was
competent for one purpose at least, as external manifestations
of the condition of her father's mind and the state of his affec-
tions and feelings. Cases cited by appellants and Rule v.
Maupin, 84 Mo. 587; McFadin v. Catron, 120 Mo. 266.
The objections to the evidence of Mrs. Schierbaum were not
as stated in appellants' abstract but were as given in re-
spondents' abstract and made after the evidence was in, and
in connection with such objections they asked to have the
evidence stricken out. The objections were general and did
not specify any reasons. It was competent at least for one
purpose, as showing the state of his affections and feelings
and the condition of his mind. If it was incompetent as a
statement of fact coming from Schemme, it should have been
limited by proper instruction. If the appellant had not
wanted this evidence to have any weight beyond its proper
and legitimate effect they should have had the court instruct
the jury as to its effect. This they did not do. Bobb v.
Ellis, 76 Mo. 459; Boggess v. Boggess, 127 Mo. 305;
Schicker v. Gordon, 19 Mo. App. 479; Koontz v. Kaufman,
31 Mo. App. 398; Clark v. Hill, 69 Mo. App. 541; Grace v.
Nesbett, 109 Mo. 9; Wright v. Gillespie, 43 Mo. App. 244.
Besides there was other competent evidence of the same fact.
George Schemme's admissions to Mrs. Schierbaum and to
Mr. Schierbaum that he had made his father believe that
Schierbaum had stolen the notes was sufficient of itself.
Eckelmeier testified to the same facts without objection from

defendants, and defendants had George Schemme to testify upon the same subject. Blackwell v. Bailey, 1 Mo. App. 328; Miller v. Miller, 14 Mo. App. 418; Bradford v. Pearson, 12 Mo. 71; Ridgeway v. Kennedy, 52 Mo. 24. (4) There was no publication of the will by Henry Schemme. It was not signed by the witnesses at his request but at the request of John Wise. Odenwaldin v. Schroer, 8 Mo. App. 467; Grimme v. Tittman, 113 Mo. 56; Walton v. Kendrick, 122 Mo. 504; 1 Redfield Wills, pp. 283-285. John Wise was acting executor and was not a competent witness to prove the execution of the will. Graham v. Graham, 4 Mo. 338; Mellinberger v. Mellinberger, 78 Mo. 27; Grimme v. Tittman, 113 Mo. 63; In matter of Wilson will, 103 N. Y. 374.

VALLIANT, J.—This is a contest of the will of Henry Schemme, deceased, which was probated in the probate court of Lincoln county in 1895. The plaintiffs are one of the daughters of the testator and her husband. Defendants are a son and another daughter of testator and the executors of the will.

The petition attacks the will on three grounds: that it was not executed in accordance with the law, that at the time of its alleged execution the testator had not mental capacity to make a will, and that it was obtained by undue influence practiced by defendant George Schemme.

The statements constituting the charge of undue influence are to the effect that the testator was old and infirm, his mind impaired by age and disease and the excessive use of intoxicating liquor, and in condition to be easily influenced by those who for the time being had his confidence; that George Schemme knowing his condition, did, just prior to the making of the will, for the purpose of influencing him to make it and to prejudice him against plaintiff Caroline, falsely and fraudulently induced him to believe that her hus-

band had stolen from him a dollar and certain notes, and under that belief the will was made. The answer was a general denial and averments to the effect that the paper was the testator's last will, etc.

The testator's wife had died some years previous to his death; his only children were the plaintiff Caroline Schierbaum, George Schemme and Sophia Ortlep. The estate was worth $15,000 to $20,000, consisting principally of the home farm worth from $7,000 to $8,000, which he devised to George, and a mortgage for $5,000 on another farm which he bequeathed to Sophia; he willed $500 to Caroline and the balance to George and Sophia. There was evidence tending to show that he had previously given Caroline or her husband sums amounting to about $7,000. The trial resulted in a verdict that the paper was not the will of Henry Schemme, deceased, which the court on motion for a new trial refused to set aside, and judgment for the contestants followed, from which the proponents of the will prosecute this appeal.

I. The formal execution of the will was proven beyond question. The testimony of the two subscribing witnesses was to the effect that the testator was of sound mind; that the will was read to him twice, that is, it was read entirely once and before signing it he asked that it be read again which was done down to and including the clause containing the bequest to Sophia Ortlep, when he interrupted the reading, saying, "Stop, that will do, that is right," and signed it. When it was signed the testator and the two witnesses were seated at the same table; he signed it first, and passed it to one of the subscribing witnesses who signed it, and passed it to the other who also signed it, then the testator handed it to Mr. Wise, one of the persons named as executors in the will and who had written it, and asked him to seal it up; Mr. Wise put it in an envelope, sealed it and handed it back to the testator who then handed it to Mr. Hardesty, who was

also named as an executor therein, and asked him to put it in the bank for safe keeping.

This testimony made a *prima facie* case for the proponents. It is suggested that it does not show that the witnesses subscribed it at the request of the testator. The whole conduct, however, was a sufficient request. The paper itself purported to be the will of Henry Schemme, it had been read in the presence and hearing of all and when he said that it was right it was equivalent to a formal proclamation that it was his will, and when he signed it and passed it at the table to the witnesses who signed it in his presence his act constituted a request that they sign it; it could mean nothing else and was as significant to that effect as if it had been put in formal words. Besides, after the trial had progressed to another stage, further testimony developed that these two subscribing witnesses had been selected for that purpose by the testator and were present in compliance with a message sent them by him.

II. Nor was there any evidence to support the contention that Henry Schemme was of unsound mind when he made the purported will. He was a German farmer and lived for a great many years on his home place which was about half a mile from Winfield in Lincoln county. He was seventy-four years old at the time of his death which occurred in August 1895, about a month after the execution of the paper in controversy. His wife died in 1885, and after that he became addicted to the intemperate use of whiskey, which impaired his physical health and, while he was under its immediate influence, rendered him mentally incapacitated for business. He had lived long in that community and was well known; his habits and conduct seem to have been subjects of general information among his acquaintances, but among the large number of witnesses called to testify none

gave any evidence that would justify the submission of the question of his sanity to the jury.

Counsel for respondent in discussing this point in their brief especially mention the testimony of Mrs. Browngardt, Mrs Catherine Schemme, Dickmeyer and Dr. Hewitt as sustaining their views.

This is what Mrs. Browngardt said: "Q. You said this morning that when Mr. Schemme was drinking he was childish and cross? A. Yes, sir. Q. How was he when sober? A. Well, he would talk right sensible then. Q. Was his mind clear and sound when he was sober? A. Not very. Q. Could he transact business when sober? A. Yes, sir; he always attended to his own business. Q. When he was sober he was a fairly good business man? A. Yes, sir."

Mrs. Catherine Schemme said: "Q. How often would he be under the influence of liquor, how often drunk? A. Oh, I can't say that; he stayed all day in the house you know. Q. Well, in his movements about could you tell whether he would stagger or not or whether he walked straight? A. Sometimes, you know, he lays down and sometimes he stays there. Q. How was he when you saw him there in July, 1895, when you went there and stayed that week; how was his condition then in his mind? A. He was a little weak." On cross-examination: "Q. As far as you know the old man always attended to his own business? A. Yes, sir; and his children helped to work for him, too. Q. But he attended to his own business, didn't he; rented out his farms and collected his rents, interest, etc.? A. Yes, sir."

Dickmeyer said: "Q. What was the condition of his mind up to the time he went down to George's? A. It wasn't very good. Q. What do you mean by not being very good? A. Well, he was getting old and childish and drink-

ing too much liquor.   Q.   When he was not under the influ-
ence of liquor do you think he was capable of attending to
his business?   A.   I guess he was, if he didn't have any at
home, but he was hardly ever without it at home, unless he
would send for a keg from St. Louis and it would not come
in time then he was out. . . . Q.   He always knew what
children he had up to the time he went down to George's?
A.   Lots of times he didn't know himself, he was so drunk;
I have picked him up often off of the railroad track just be-
fore the Denver came along.   Q.   When he was not drunk
do you think he had sense enough to know that he only had
three children?   A.   I guess so.   Q.   Do you think he had
sense enough to know who those children were?   A.   Yes,
sir; if he was sober.   Q.   When he was sober do you think
he had sense enough to know what property he owned?   A.
Yes, sir.   Q.   Now in fact he was a pretty good business
man, wasn't he when he was sober?   A.   He was good
enough to beat me out of $25 for labor, that was for work
years and years ago, about 25 years ago when I first came to
this county."

Dr. Hewitt who had been his physician for many years
and attended him in his last illness, testified that his mind
was as good as the average man's mind at his age, that he re-
garded him sound.   This witness had not only been his phy-
sician but had had business with him, in the organization of
the bank at Winfield.   On cross-examination he said that he
had advised Schemme that if he did not quit drinking whis-
key it would kill him and that he did not quit.   And under
further cross-examination he said:   "Q.   I will ask you the
question whether or not Henry Schemme's mind as well as
his body was impaired and weakened by the excessive use of
intoxicating liquors?   A.   As his body weakened his mind
necessarily weakened in proportion.   That is the case with
anybody no matter what they drink.   Q.   What was the
condition of Henry Schemme's mind during the last six

months, especially about the time this will was made, as compared with the time before he was suffering with atonic dyspepsia? A. I don't know that I noticed any particular difference. Q. You think his mind about that time, the time he made this will, was as good as you had ever seen it? A. Of course I don't know that I could say that it was just as good, his mind was not weakened to that extent you could notice it."

We have quoted from these four out of the large number of witnesses because they are especially selected by counsel for respondents in their argument in justification of the court's refusal to give the instruction asked by appellants to the effect that there was no evidence to show that the testator was of unsound mind. The counsel for respondent do not appear to have considered at the trial that there was any evidence sufficient to go to the jury on the point, for they asked no instruction on it, at least the record does not show any and none was given. But as that was one of the grounds of attack and testimony designed to sustain it was introduced, which, without instruction, the jury were liable to misapply, the appellants were entitled to the instruction they asked taking that issue from the jury. It was error to have refused that instruction. [Harvey v. Sullens, 56 Mo. 372; Young v. Ridenbaugh, 67 Mo. 574; Jackson v. Hardin, 83 Mo. 175; Norton v. Paxton, 110 Mo. 456; McFadin v. Catron, 120 Mo. 252; Martin v. Baker, 135 Mo. 495.]

III. The main forensic contest was upon the third ground of attack upon the will, to-wit, the alleged undue influence exerted by George Schemme.

The testator had but three children, Caroline, the eldest, who married Herman Schierbaum in 1880, and went to Winfield to live with her husband, George and Sophia, who continued to live with their parents until 1885, when their mother died, and after her death until 1888, when they both married. Then Sophia and her husband went to live on the

Wallenbrook farm; but George's wife and his father did not get along well together and they moved to the Wallenbrook farm and Sophia and her husband moved back to her father's farm; but after a year or so her husband and the old man had a falling out and they moved to St. Charles and George and his wife came back to live with his father. But trouble came on again between George's wife and his father and in 1892 they moved to Winfield. Then Caroline came and lived with him until in 1893 when he rented the farm to Browngardt and then Caroline went back to Winfield and the old man lived on the farm with the Browngardts until about a month before his death when he moved to George's in Winfield, where he died. For sometime before he moved to George's he had been going daily to Caroline's in Winfield and taking his dinner with her, and he was having a room added to Schierbaum's house with a view of moving there to live. The will in question was executed Tuesday, July 9, 1895. On the Saturday night before, Schierbaum had been at the farm to visit the old man and had remained with him until nine o'clock. George was also there that night and remained until the next morning, but did not sleep in his father's room.

The evidence showed that the testator held the promissory notes of Schierbaum for a considerable amount, given for money loaned or advanced him. It also showed that at the time this will was made the testator had missed those notes and a dollar from the drawer or box where he had kept them and he suspected Schierbaum of having stolen them; he afterwards found the missing dollar but he died under the belief that the notes were gone. The whole force of the plaintiffs' attack on this will is concentrated in their proposition that George took the notes, made his father believe that Schierbaum had taken them, and thereby so prejudiced him as to induce him to make the will cutting off Caroline with $500. If the proposition were true in fact the conclu-

sion of law which the respondents would draw from it is correct; a writing obtained under those circumstances is in contemplation of law the result, not of the will of the maker, but of the fraud practiced upon him.

When a will is shown to have been executed according to the requirements of law by a man of sound mind, the burden of proving that it was the result of fraud or undue influence is upon the contestant who makes the charge. The mere fact that it apparently unjustly discriminates against one of the testator's children in favor of another does not shift the burden of proof on that other to account for the discrimination. A man has the right to will his property to whomsoever he chooses and the beneficiary in his will is not bound to account for the choice. To hold otherwise would seriously impair the right to dispose of property by will. McFadin v. Catron, *supra*. There is no evidence in this case to show that the testator regarded one of his children with more affection than another, but there was evidence to show that he intimated that he had previously given Caroline or her husband as much as either of the other two would get by the will and that he did not think Schierbaum (he seemed in speaking of it to have merged Caroline in her husband) was entitled to as much then as either of the other two. Long before this will was written he had expressed himself in this way and had frequently said that he intended to leave the home place to George and the other place to Sophia. He had in fact made one or two other wills as far back as 1885 which were substantially like this one and then said that Schierbaum had had enough. Those previous wills he afterwards destroyed and was heard to say he would never make another, that the law makes the best will.

No attempt was made to account for the destruction of there previous wills. Whether it was during a period of hostility with George's wife or Sophia's husband or from any other cause, is left to conjecture, but the fact is, he

changed his mind, as he had a right to do, and that fact is all that we are concerned with. The next day after he went to George's, he, George and Hardesty went back to the farm to look for the missing notes. On the way Hardesty explained to him that the loss of the notes would not prevent their collection. At the farm Hardesty and the old man searched for the notes but could not find them. The will was made the next day and the testator died about three weeks thereafter. The day after the death of his father George went to the farm and in company with Browngardt went into the room formerly occupied by his father and looked among his papers to get a paper relating to the family record for the preacher who was to preach the funeral sermon. This he got and went away, at that time he had the keys to the room and the drawers. After the will was probated the executors, Wise and Hardesty, in company with George, went to the farm to examine the papers. When they opened the box of papers the Schierbaum notes were there on top and the first papers seen. This was the same box that Hardesty and the old man had searched the Monday before the execution of the will. The inference which the plaintiff draws from these circumstances is that George took the notes the Saturday night he stayed at the farm and returned them when he came the day after his father's death to get the family record.

It appears from the evidence that on the Saturday night when Schierbaum was at the farm it was arranged between him and the old man that he was to go to St. Louis the next day to bring Mrs. Catherine Schemme to the farm to take care of the old man until the room at Schierbaum's would be finished for him, and that Schierbaum went to St. Louis accordingly and Mrs. Schemme came the following Wednesday.

George's testimony as to his visit to his father on that Saturday night was that early the next morning his father told him that he had missed the Schierbaum notes and a dollar and that he suspected Schierbaum of having taken them;

that was the first information he had that his father held notes of Schierbaum's; he and his father then looked through some papers but could not find the notes; before he left, his father told him that he was sick and could not stay at the farm any longer, asked him to speak with his wife about it and take him to their home; George went home and returned to the farm about ten or eleven o'clock that morning with his wife who had a talk with his father and then they took him home; that he never suggested to his father that Schierbaum had taken the notes.

Fritz Meyer, a witness for defendants, testified on cross-examination that the old man had told him a month before he moved to George's that the Schierbaum notes were missing.

Evidence tending to prove the above mentioned facts and circumstances is all the legitimate foundation there is in this record upon which to build the plaintiff's theory of fraud and undue influence.

There was other evidence which we will presently consider upon which they relied, but unless the above circumstances alone constitute a chain of evidence from which the jury might legitimately find that George abstracted the notes and imposed on his father the belief that Schierbaum had taken them and that that fact was the cause of the will, the court should not have submitted that issue to the jury.

The most that can be said for this chain of circumstances, from respondents' point of view, is that George had an opportunity to do what they charge against him. But even the opportunity was not very clear. It is not shown that he handled his father's papers or that he had access to them. The single fact is that he spent the night there, sleeping in another room than his father's. To give effect to the respondents' theory we must assume that in the night when his father was asleep he entered the room, whether the door was locked or left unlocked we are not informed, found the keys

to the drawer containing the papers, overcame whatever other impediments he might have encountered, and carried the notes away. The fact that the notes were found in the box where search had before been made for them and that George had had the opportunity to put them there are circumstances upon which respondents lay great stress. Again, it must be noted that this opportunity was not clear, for one of plaintiff's witnesses, Browngardt, was with George when he went into the room and opened the drawer to search for the family record, assisted him in the search, and saw or had opportunity to see everything that he did, yet he saw nothing of the kind that is charged. And when we are asked to draw conclusions from opportunities, we should not forget that this same witness for plaintiffs, and for whose testimony they ask great respect, said that on the Saturday night in question he saw Schierbaum sitting on the floor close to the bureau drawer handling papers, he and the old man were looking over them together. We mention this not to reflect upon Mr. Schierbaum, for in fact we do not think there is anything in the record to justify a belief that either he or George Schemme took the notes, but we mention it to illustrate how unreliable as a source of legal inference such an opportunity is, yet such is the strength of the respondents' case. In the so-called chain of circumstances there are too many missing links to render the deduction, that the respondents seek to draw, reasonably safe. The old man was just as sure that the dollar was gone as he was that the notes were gone, yet he afterwards found the dollar just where he had put it and where he had previously looked for it in vain, and where the notes, after he and Hardesty had shuffled the papers in their search, were found by the executors. It is not more improbable that in the very search the old man, in his nervous condition, made for the supposed missing notes, they were turned up and left on top of the other papers in the box as they were found, than that George entered the room at

night and took them away and afterwards returned them so skillfully that Browngardt who was present did not see him do it. The one theory rests as much on conjecture as the other and neither has sufficient foundation to support a verdict.

The burden was upon the contestants to establish the fraud or undue influence charged, and not only that, but their burden was to overcome that presumption which exists in favor of the will when its formal execution was shown and mental capacity of the testator established. In a recent case this court per ROBINSON, J., said: "Undue influence can not be presumed from a mere coincidence of opportunity to influence........ Affirmative proof of such undue influence is required to be made either by direct facts shown, or of facts and circumstances, from which undue influence re-·sults, as a reasonable and fair inference and not as a mere conjecture." [Doherty v. Gilmore, 136 Mo. loc. cit. 419, 420.]

IV. The next day after the will had been made the Schierbaums heard of it and heard that the old man suspected Schierbaum of having taken the notes and they went to him about it. Over the defendants' objection Mrs. Schierbaum was permitted to testify that her father then told her that George had made him believe that Schierbaum had taken the notes, and that her father also said that he had mistreated her in the will but would change it before he died.

Testimony which purports to relate what a testator said, after making a will, in relation to the causes which influenced him to make it, is in the category of hearsay evidence and is incompetent. This principle was first announced by this court in an opinion by LEONARD, J., in Gibson v. Gibson, 24 Mo. 227, and reiterated in several decisions since. [Walton v. Kendrick, 122 Mo. 504; Gordon v. Burris, 141 Mo. 602.]

These rules of evidence are not established by mere arbitrary law, nor are they designed to restrict the legitimate

range of inquiry in the trials of disputed facts. But on the contrary they are made in the interest of justice, and experience demonstrates their wisdom. In a heated conflict where enmity often supplements interest the aptitude to misunderstand and even the temptation to misrepresent is not infrequently apparent. Even when a rehearsal of a conversation is admissible in evidence the courts are fond of saying that little weight is given to what dead men are said to have said.

The learned counsel for respondents say that the objection to this evidence was not specific enough and that since it was admissible to show the condition of the testator's mind and his regard for his daughter it was not error to have admitted it. But we can not mistake the purpose for which it was offered nor the prejudicial effect it was likely to have had. The whole context shows that it was offered to prove that George practiced that imposition on his father and it could have been weighed by the jury in no other light. He denied upon the stand that he had done so, but it was easy to argue that of course he would deny it. The court erred in admitting that evidence.

V. Mrs. Schierbaum was also permitted over the objection of defendants to testify to the effect that when she and her brother sat together by their father on his dying bed her brother told her that he had made their father believe that Schierbaum had taken the dollar and the notes, but that if Schierbaum would not make him trouble about it he would make it all right with the will.

In an early case this court in an opinion by NAPTON, J., held that in a will contest a declaration of one devisee in the nature of an admission might be given in evidence not only as against himself but also as against the other devisees. [Armstrong v. Farrar, 8 Mo. 627.]

The rule was there announced, however, with hesita-

tion. The court said: "The rule, as we suppose, is founded, first, upon the reasonable presumption, that no person will make any declaration against his interest, unless it be founded in truth; and, second, upon the fact, that the person making the declaration against his interest, being a party to the suit, can not be examined, and therefore does not conflict with the established maxim, that the best evidence which the nature of the case admits of must be produced." Then after some discussion of authorities on the subject the court adds: "Without feeling under the necessity in this case, of determining which of these conflicting adjudications should be followed, we may safely adopt the rule, that where both reasons concur, where the admission is against the interest of the person making it, and that person is a party to the record, it is evidence against the party making it, and his co-parties, where there is a joint interest or privity of design between them." Some further discussion of authorities follows, and the court again says: "It is clear, that confessions or admissions of a party are only evidence against him when parol evidence of the same fact would be competent, or, in other words, when in the judgment of the law, higher and better evidence in existence can not be produced....... Hence where the party himself can be examined, his admissions are no evidence."

That decision was rendered in 1844, when a party to the suit was incompetent as a witness.

In Hurst v. Robinson, 13 Mo. 82, the same rule was announced and Armstrong v. Farrar, cited as authority for it, but the admission in that case was of one former partner concerning a partnership transaction and where there was a joint interest. In Allen v. Allen, 26 Mo. 327, it was held, citing Armstrong v. Farrar, that the admissions of an administrator, he being also a distributee of the estate, were competent as evidence in support of a claim presented for allowance against the estate.

In Jackson v. Hardin, 83 Mo. loc. cit. 186, it was said by PHILIPS, C., *arguendo*: "The general rule is that the admissions or statements of one of the parties to the record in an action of this character" (will contest) "is admissible against all the defendants, because there is a joint interest in all." And Armstrong v. Farrar, *supra,* is cited as authority for the proposition. But in Jackson v. Hardin, the court was dealing with the converse of the proposition, and the only point decided in that connection was that the trial court did not err under the circumstances in sustaining objections to questions calling for such admissions. Those are all the cases in our reports that we have seen in which Armstrong v. Farrar is relied on, and an examination of them shows that they do not involve the question we are now dealing with.

In Von De Veld v. Judy, 143 Mo. loc. cit. 368, the question is incidentally considered and SHERWOOD, J., for the court, said: "There are authorities in this State to the effect that such admissions are competent evidence. But on the other hand there is much authority to the contrary, and perhaps the great preponderance of authorities is opposed to the view asserted in the early case of Armstrong v. Farrar, 8 Mo. 627."

The law has been changed by the legislature since Armstrong v. Farrar was decided, by removing one of the reasons on which the decision was based, that is, that the party himself could not be called as a witness, for, as we have seen, it is the language of the decision itself that "where the party himself can be examined his admissions are no evidence."

The Supreme Court of Pennsylvania in an early contested will case said: "Margaret King was a principal devisee in the will, which gave her the whole estate (except a few legacies to a small amount) for her life; after her death one-half was to go to her relations, and one-half to the relatives of the testator. . . . . . . . Granting that she is so

much a party to the suit, that her confessions might be evidence against herself, these confessions are not the confessions of the others, who have a separate interest. It is not like the case of joint partners, where the confession of one may be used against both. We are now to establish a general principle to govern all cases of this kind. It happens that Margaret King has a large interest under this will. But if her declarations are evidence, so also must be the declarations of a legatee, who takes but five dollars, or any other sum. The *quantum* of interest will make no difference." [TILGHMAN C. J., in Nussear v. Arnold, 13 Serg. & Rawl. loc. cit. 328.] And later that court per WOODWARD, J., said: "The general rule of law consonant with reason is, that one person is not to be prejudiced by the unauthorized declarations of another. The exceptions to this rule are found in those cases where there is a joint interest or privity of design between several. In such case each is presumed to speak for the whole; but where there is neither joint interest nor combination, where each claims independently of the other, though under a common instrument, the words of one no more than his acts can bind the other. The interests of these devisees and legatees under the will are several and joint; and hence the three who impeach it were bound, on principle, to produce evidence that was competent against all the rest." Clark v. Morrison, 25 Pa. St. loc. cit. 456. See, also, Titlow v. Titlow, 54 Pa. St. 222.

The Supreme Court of Massachusetts in such a case used this language: "Devisees or legatees have not that joint interest in the will which will make the admissions of one . . . . . . . . admissible against the other legatees. . . . . . . . Admitting for the present that any interest in a will obtained by undue influence can not be held by third parties, however innocent of the fraud, and that the gift must be taken tainted with the fraud of the person procuring it, still it by no means follows that the interest of the other innocent legatees should

be liable to be divested by the subsequent statements of the parties procuring the will. Such a rule would violate all sense of right, and is not sustained by the decisions." [Shailer v. Bumstead, 99 Mass. loc. cit. 127-8.] Those decisions are found frequently quoted in the later decisions on the question. To the same effect are Forney v. Ferrell, 4 W. Va. 729; Osgood v. Manhattan Co., 3 Cowen, 612; Dan v. Brown, 4 Cowen, 492; In re Will of Baird, 47 Hun. 77; Thompson v. Thompson, 13 Ohio St. 356; Blakey v. Blakey, 33 Ala. 616; O'Connor v. Madison, 98 Mich. 183; Dale's Ap. 57 Conn. 127; Hellman v. Burritt, 62 Conn. 438; Underhill on Evid., sec. 67; Am. & Eng. Ency. of Law (1 Ed.), vol. 9, p. 343.

Greenleaf lays down the general principle that where there is a joint interest the admission of one may be given in evidence against all, and that principle all the authorities recognize. [1 Greenl. on Evid. (16 Ed.), secs. 171-2-3-4.] And he says that it has been decided that the rule applies to devisees or legatees under the same will, and cites some early decisions to that effect. He does not say, however, that such is a correct application of the rule, but cites in the same note decisions to the contrary.

We are satisfied both on reason and authority that the rule laid down in the Pennsylvania and Massachusetts cases above quoted is right and that that stated in Armstrong v. Farrar, *supra,* whilst it is correct as applied to cases of joint interest, is no longer to be regarded as the correct rule applicable to devisees or legatees holding separate rights under a common will.

In the case at bar George Schemme was not the only party interested in upholding this will, his sister Mrs. Ortlep had a large separate interest of her own that he could not destroy by any admission or act of his.

It was error to have admitted the testimony of Mrs.

Schierbaum as to the alleged declaration of George at the bedside of his father.

The testimony of Eckelmier as to the similar conversation alleged to have been had by George with Schierbaum at his shop was incompetent for the same reason. Although the record does not show that there was any objection to Eckelmier's testimony, yet, as it came after the court's ruling on the same kind of testimony by Mrs. Schierbaum, it is covered by the objection. Where a party has seasonably objected to evidence of a certain character by one witness and his objection is overruled, he is not required or expected to repeat his objection when testimony of the same kind by another witness is offered; indeed proper decorum would indicate that he should not do so. Eckelmier's testimony on this point should have been excluded.

Eliminating from the case what the testator after making the will is said to have said, and what George is said to have said, the respondents have nothing upon which to construct their theory of fraud and undue influence except the facts that the old man missed the notes and George had the so-called opportunities of doing what he is accused of having done. No reasonable inference of fraud or undue influence can be drawn from those facts, and the court should have given the instruction asked by the defendants withdrawing that issue from the jury, and instead of the instructions given should have directed peremptorily a verdict for the proponents establishing the will.

The judgment of the circuit court is reversed and the cause remanded to that court with directions to enter judgment that the paper writing propounded is the last will and testament of Henry Schemme, deceased. All concur.