## PEPPER et al. v. TRUITT et ux.

### Civ. No. 2348.

District Court, W. D. Oklahoma.

March 31, 1947.

Riley Strickland, of Amarillo, Tex. (Grester H. Lamar, of Guymon, Okla., on the brief), for plaintiffs.

James S. Twyford, of Twyford & Smith, of Oklahoma City, Okla. (L. E. Tryon, of Rizley, Tryon & Sweet, of Guymon, Okla., on the brief), for defendants.

VAUGHT, District Judge.

On June 14, 1945, the plaintiffs filed this action seeking to set aside a conveyance of real estate by warranty deed executed by William D. Henderson, a single man, on June 30, 1938, by the terms of which he conveyed to Lela Truitt certain real estate in Texas County, Oklahoma. The deed was duly recorded in Texas County, Oklahoma, on that date. The complaint alleges that two of the plaintiffs are beneficiaries under a codicil of the will of William D. Henderson dated October 25, 1940, and by virtue thereof are entitled to recover said real estate. They attack the deed on the ground that it was procured upon the consideration that Lela Truitt and W. J. Truitt were to care for William D. Henderson during his lifetime, and that such consideration failed. The defendants, W. J. Truitt and Lela Truitt, deny that there was any

such consideration, and claim the conveyance of the real estate was a gift to Lela Truitt, fully executed. A motion to dismiss the complaint was sustained by this court on January 31, 1946. The plaintiffs appealed and the cause was reversed and remanded. Pepper et al. v. Truitt et al., 10 Cir., 158 F.2d 246. The cause comes on now for trial in accordance with the views expressed in that opinion.

On account of the character of the case, the court has deemed it advisable to permit the parties considerable latitude in the submission of evidence. This is one of those situations that frequently develop in human relations, where a man accumulates considerable property in life and has no close relatives at the time of his decease.

William David Henderson was born February 15, 1860 and his brother, Robert Perry Henderson, was born December 29, 1861. In March, 1900 these two brothers were engaged in the mercantile business as partners at Carthage, Texas. On March 31, 1900 Perry Henderson and the defendant Lela Truitt were married at Carthage, Texas, and William D. Henderson, who never married, made his home with them. They continued to live at Carthage until some time in 1909 when they removed to Texas County, Oklahoma; the two brothers opening a store northwest of Guymon, Oklahoma. William D. Henderson continued to live with them until the death of his brother Perry on December 25, 1915. After the death of Perry Henderson, his widow Lela succeeded to his interest in the partnership. For a period of 10 months, during which time the home was maintained as before, William D. Henderson lived in that home. Some time in 1916 Lela and William D. Henderson traded their mercantile business for the real estate involved in this action. It consisted of three quarters of a section of land and the title was taken in the names of Lela Henderson and William D. Henderson, an undivided one half interest in each. Lela Henderson being then in poor health went back to Carthage, Texas, and stayed for about a year. William D. Henderson went to Guymon, Oklahoma. Some time in 1917 Lela Henderson came back to Texas County, Oklahoma, and went to live upon the land in question. William D. Henderson then established his home there also, which was thus maintained until Lela Henderson, on March 31, 1923, married W. L. Truitt who lived on an adjoining farm. At this time Henderson left and was away about a year. He then returned to make his home with the Truitts until Mrs. Truitt became ill, when he went to Guymon and lived with a family named Allen for some years, but returned to the Truitt home at intervals. In 1927 he had an operation and while convalescing stayed in the Truitt home where he was cared for by Mrs. Truitt. In January, 1937 he again went to live with the Truitts, residing there continuously until June 12, 1940. During the time Henderson lived with the Truitts he paid board at approximately $35 per month. On February 2, 1937, Henderson made a will bequeathing his property to W. J. Truitt and Lela Truitt, share and share alike, and naming W. J. Truitt executor to act without bond. On June 30, 1938, Henderson made, executed and delivered a warranty deed to his undivided one half interest of the real estate involved here to Lela Truitt. Since that time Lela Truitt has been in possession of the land, has paid the taxes on it, and has taken the proceeds of the land.

The feeling between Mrs. Truitt and William D. Henderson was akin to that of brother and sister. Joe M. Dean testified that he and Henderson had been close friends for many years; that he had known Henderson since 1910; and that some time in either 1936 or 1937 Henderson told him of his feeling for Mrs. Truitt. In answer to the question: "Did he ever discuss with you about how he felt toward Mrs. Lela Truitt?", he answered: "* * * he told me, Miss Lela has been a true friend to me, when my brother was alive and since she married Truitt; that she had done more for him than his folks had ever done. * * * He said he didn't know how he would ever repay her but might do it at some later time."

The evidence discloses that Henderson was in good health mentally and physically for a man of his years until the early part of 1939 when his health and memory began to fail. In May, 1940 both Mr. and

Mrs. Truitt, who were in their 70th year, became ill; Mr. Truitt was stricken with Parkinson's disease; Mrs. Truitt began to fail and was seriously troubled with an intestinal condition. Henderson had reached the age of 80 and they were all concerned about each other's condition. Henderson had no close relatives living except a first cousin in Alabama, who had a son, Dewey B. Pepper, and a daughter, Essie Ree Saxon, plaintiffs here. At the request of Henderson, Mrs. Truitt wrote similar letters, dated May 23, 1940, to Mr. Pepper and Mrs. Saxon, stating the conditions and asking one of them to come and take Henderson to their home in Alabama to care for him. She informed them that he was able to take care of himself physically but his memory was bad, and that he had ample money to pay for his care. Both of these letters were promptly answered. Mrs. Saxon suggested that Mr. Henderson send her and her husband a round-trip ticket to come for him as they were not at that time able to finance the trip. Mr. Pepper said he would be glad to make a home for Mr. Henderson, but if he came for him he would be compelled to lose some time and he did not feel he could do so without pay. In the meantime Mr. and Mrs. Truitt had gone to the hospital. Mr. Henderson, in response to the letters, had $24.00 mailed to Mr. Pepper or Mrs. Saxon but when Mrs. Truitt returned from the hospital, he could not remember the amount he had sent.

On June 10, 1940, Dewey B. Pepper, his 12 year old son, and Mrs. Saxon arrived at the Truitt home at Guymon, Oklahoma. Henderson at that time had money and investments in personal property of approximately eight or nine thousand dollars. Mr. Truitt gave a list of those assets to Mr. Pepper and Mrs. Saxon. Pepper and Mrs. Saxon stayed at the Truitt home two nights and one day. While in Guymon, Pepper made extensive inquiry from other sources than the Truitts as to what property Henderson had. He had the county assessor run the records to ascertain whether Mr. Henderson owned any real estate in the county of record, and found none. On the morning of June 12, 1940, Mr. Henderson settled with Mr. Truitt his board to date, paying for the 12 days of June. Pepper then went with Henderson to the First National Bank of Guymon where Henderson drew out all his funds on deposit amounting to $242.35. Pepper and Mrs. Saxon then left Guymon with Henderson on that same day. They drove to Amarillo, Texas, where Henderson sold some stock and the money followed to Alabama in a few days. They then drove to Tulsa, Oklahoma, where Henderson sold building and loan stock amounting to about $3,000. On July 2, 1940 (less than three weeks after they had left Oklahoma), Mr. and Mrs. Dewey Pepper, Mrs. Saxon and Henderson returned to Guymon where Henderson sold some Masonic bonds. *They did not visit the Truitts upon that occasion.* But while Pepper and Mrs. Saxon were in the bank and Mrs. Pepper and Henderson were waiting in the automobile, Mr. Truitt stopped and talked with Mr. Henderson. Mrs. Truitt did not see them on that occasion. The amount of funds belonging to Henderson and acquired by the parties at the conclusion of the July 2, 1940 trip was over $5,000. This money was deposited in a bank in Alabama in the names of Henderson, Pepper and Mrs. Saxon where it remained until the death of Henderson when it was withdrawn and divided between Pepper and Mrs. Saxon, from which the expenses of the last illness and funeral were paid. Approximately a month prior to the death of Henderson a check was received by him in payment of some bonds in the sum of $4,068.75. He endorsed the check and instructed Pepper and Mrs. Saxon to deposit it to their credit as a gift to them. This money was treated as a gift by Pepper and Mrs. Saxon, was divided between them, and never considered as a part of the estate. At the time of his death, Mr. Henderson had $37 on his person which also was taken by Pepper and Mrs. Saxon. The entire amount acquired from Henderson by Pepper and Mrs. Saxon, after taking charge of him on June 12, 1940 up to the time of his death, was $9244.67. Deducting the amount reported for the last illness and funeral expenses left a net of $8,244.67.

On October 25, 1940, in the State of Alabama, William D. Henderson executed a codicil to the will dated February 2, 1937,

in which he revoked the devise as to the real estate and made a different provision as follows:

"Now, I hereby revoke said devise and bequeath in said Will, which was made to Mr. and Mrs. W. J. Truitt, and it is my intention here to change my said gift, devise and bequeath, to my real estate, which I possess at the time of my disease, from Mr. and Mrs. W'. J. Truitt, to Dewey B. Pepper and Mrs. Essieree Saxon, and by this codicil, to my Last Will and Testament, I do give, devise and bequeath to my beloved cousins, Dewey B. Pepper and Mrs. Essieree Saxon, all my real estate, to be theirs absolutely, to be held by them, the same as if it had been included in the original Will, and as if it had been included in the original gift, devise and bequeath, to the said Dewey B. Pepper and Mrs. Essieree Saxon.

"It being my intention here to change the gift, devise and bequeath of my real estate from Mr. and Mrs. Truitt to Dewey B. Pepper and Mrs. Essieree Saxon."

This codicil was probated in the probate court of Jefferson County, Alabama, January 21, 1944, and the plaintiffs Dewey B. Pepper and Essie Ree Saxon claim the real estate in controversy as devisees under that codicil.

All of the foregoing is shown by the undisputed testimony. The disputed testimony will now be considered.

The plaintiffs contend that consideration for the conveyance of the real estate by warranty deed from William D. Henderson to Lela Truitt on June 30, 1938, was an oral agreement between William D. Henderson and the defendants W. J. Truitt and Lela Truitt by the terms of which the Truitts were "to take care of Henderson during his natural life," and that such consideration failed. To substantiate this contention the plaintiffs introduced the testimony of Mrs. Rachel Tate, Mrs. C. E. Amberson, Dewey B. Pepper, Mrs. Dewey B. Pepper and Essie Ree Saxon.

Mrs. Rachel Tate, a sister-in-law of Dewey B. Pepper and a witness to the codicil to the will, testified that upon that occasion Henderson made the following declarations as to the transfer of the real estate to Mrs. Truitt: "He said he had made his will and had deeded the real estate to Mrs. Truitt, but she had failed to carry out her agreement to take care of him the rest of his life and that he would like to change his will to Mr. Pepper and Mrs. Saxon." And that prior to that time and since, he had made similar statements.

Mrs. C. E. Amberson, a close neighbor of Dewey B. Pepper and also a witness to the codicil, testified that at the time the codicil was executed, Henderson made the statement as follows: "He said he wanted to make a will to Mr. Pepper and Mrs. Saxon because the Truitts had promised to take care of him for life and they had failed to carry out their promise."

Mrs. Dewey B. Pepper, the wife of Dewey B. Pepper, testified, in answer to the question whether Henderson owned a section of land, as follows: "Well, a half section, I believe, he would talk about, jointly with his sister-in-law, and they had refused to keep him the remainder of his life and he didn't want them to have it any more since they had broken their promise. They had promised to keep him the remainder of his days."

Dewey B. Pepper testified: "Mr. Henderson told me that he had made a will and deed to the Truitts and at that time they promised to take care of him the rest of his life and they had failed to carry out their agreement."

■ The defendants insist that these purported statements and declarations by Henderson are hearsay evidence and should not be considered. While the testimony is of a doubtful character and, if considered at all, should be considered with caution, yet much latitude should be given in this character of case, and such statements and declarations considered together with the other evidence, for what they are worth. These statements and declarations were made outside the presence of the defendants, with no opportunity to deny them at the time they were made, were selfserving in their character, and are dependent upon the memory of the witnesses. Such alleged statements and declarations were made under peculiar cir-

cumstances and after Henderson had left Guymon, Oklahoma, with the plaintiffs. Schierbaum v. Schemme, 157 Mo. 1, 57 S. W. 526, 530, 80 Am.St.Rep. 604.

In Miller v. Miller et al., 55 Cal.App.2d 199, 130 P.2d 438, 443, the court said: "Referring to the reference in his will to one of the parcels as 'my Sierra Madre property' it was not incumbent upon the court to believe that decedent intended by such reference to annul all that he had done in the execution of the conveyance to respondents. Such statement was not binding upon his grantees. Chard v. O'Connell, 7 Cal.2d 663, 667, 62 P.2d 369; Bollinger v. Bollinger, 154 Cal. 695, 706, 99 P. 196. It may be declared to be the rule that a grantor of lands is estopped to repudiate his grant by a subsequent declaration either in his will or by a parol utterance to third parties. A solemn instrument, such as a grant deed, cannot be defeated by an informal statement to which the grantee was not even a witness. If so, no title would be secure against attack if the author survived the last conveyance or ex parte declaration. The last will of a testator has its own sphere of operations and when drawn with statutory precision is potent in effecting the succession of an estate. But if the author may have seen fit to make gifts of his properties inter vivos, his final testament becomes only a flourish and perhaps only the expression of his heart's desire on the day of its execution."

In the letters of May 23, 1940, written by Mrs. Truitt to the plaintiffs at the direction of Henderson, it was stated: "His memory is bad and getting worse." Within two weeks, June 24, 1940, after leaving Guymon with Henderson and after the plaintiffs had come into joint possession of a large part of his personal property, we find one of the plaintiffs, Essie Ree Saxon, writing a letter to Mrs. Truitt in which she took sharp issue with the idea that the memory of Henderson was bad, in the following words: "I can't seem to understand just where anyone got the idea that his mind wasn't in perfect condition. As an example of this he has recalled many little happenings that would try anyone's memory. He seems to remember every little thing that has happened to him in all his life. There is nothing wrong with his mind at all."

In view of later developments, as shown by the evidence, one cannot escape the conviction that the plaintiffs had in mind at that time some course of action in which the question of the memory of Henderson might become an issue. And when the entire record is considered, very little, if any, weight can be given to such statements and declarations made by Henderson, after his departure from Guymon on June 12, 1940, as to the consideration for the deed of June 30, 1938.

Dewey B. Pepper testified further as follows: "Well, they said the reason they wrote us to come after him, they wasn't able to keep him any longer, and wanted us to carry him back with us, and that night we were talking, and we asked about the real estate, the land. Mrs. Truitt says 'He gave that to me for other considerations,' and we talked on awhile and so the next morning—or when we started to leave, Mr. Truitt came to the car and told us to take Mr. Dave home and take good care of him and at the end of his time we would have a settlement. * * * Q. (By The Court) I am asking about all the conversations you had with Mrs. Truitt before you left Guymon. I want to get that. A. Mrs. Truitt told us that the land was given to her for other considerations."

A letter was introduced by this witness from Mrs. Truitt to the witness dated June 22, 1940, which among other things contained this sentence: "I have promised Bro. David to look after him and see that he is taken good care of."

Correspondence between the parties consisting of 21 letters, which speak for themselves, was introduced. Aside from this one sentence stressed by the plaintiffs, there is nothing in this correspondence that even remotely intimates that such a promise was the consideration for the deed of June 30, 1938. The letter when read as a whole cannot be so construed, but upon the contrary it shows merely a sisterly in-

terest in Mr. Henderson and his welfare. It reads:

'Guymon, Okla.
6–22–40

Mr. Dewey Pepper
Birmingham, Alabama.

Dear Dewey:

You promised me to let me hear from Bro. David as soon as you got home. It has been over a week now and not a word have I heard from you nor your sister. I have promised Bro. David to look after him *and see* that he is taken good care of. I am very uneasy about him and very anxious to hear from him. If I don't hear soon, I'll come and see what is the matter. Please let me hear how he stood the trip, how he is now and where he is and if his mind is better or worse.

Please let me hear immediately. Hoping to hear from you soon, I am

Yours sincerely
/s/ Mrs. W. J. Truitt"
(Emphasis supplied.)

Ten days had elapsed since Pepper had left with Henderson. Mrs. Truitt had never seen either Pepper or his sister until they came to Guymon. Naturally she had been anxiously awaiting word of his safe arrival in Alabama and how he stood the trip; it was the normal thing to write as she did. Certainly there is nothing in this letter that under the circumstances could be construed into any such oral agreement as the plaintiffs contend for here.

Mrs. Essie Ree Saxon testified to conversations she had with Mrs. Truitt when they were at the Truitt home in June, 1940, as follows:

"Well she said that Cousin David's health had gotten so bad until she wasn't able to take care of him any more and that she wanted us to give him a home."

"Mrs. Truitt said she would like for us to take him because she wasn't able to give him a home any longer and I asked her about his real estate and she says 'Well' she says 'he has given that to me for consideration' and of course I didn't inquire as to the considerations what they were."

"Mrs. Truitt voluntarily told me he would have enough to take care of him and that he would use that to take care of himself and would pay us to take care of him."

"Yes, sir. Mrs. Truitt told me repeatedly while I was there for us to take him and at his death we would have a settlement. She told me that repeatedly."

"We were all in the room together and I asked the question as to what had been done with his real estate and Mrs. Truitt says 'He deeded me that' and he says 'for considerations' with his fingers like this (indicating) and she says 'yes for considerations.' "

She testified that on the July 2, 1940 trip they had gone back "to settle up his affairs, *we* had decided he would be content and *we* would settle his business affairs."

One looks in vain for any such oral agreement as a consideration for the deed of June 30, 1938 as contended for by the plaintiffs; or for any testimony from which such an agreement might be inferred. The witness testified that she, her brother, Henderson and Mr. and Mrs. Truitt were all in the room. She made the inquiry; she was endeavoring to elicit information. The statement was made that Henderson had given a deed to the real estate to Mrs. Truitt. Henderson spoke up and said "for considerations;" Mrs. Truitt said: "Yes, for considerations." Nothing was said or inferred that the consideration was an oral agreement such as contended for by plaintiffs. That was the natural time for Henderson to make such a claim if it existed. The fact that he did not make such a claim is a strong circumstance showing that it did not exist.

The testimony of the defendants, W. J. Truitt and Lela Truitt, concerning the execution and delivery of the deed of June 30, 1938, was offered. To which counsel for plaintiffs objected under Section 384, Title 12 Okl.St.Ann. 1941, which statute reads:

"No party to a civil action shall be allowed to testify in his own behalf, in respect to any transaction or communication had personally by such a party with a deceased person, *when* the adverse party is the *executor, administrator, heir at law,*

*next of kin, surviving partner or assignee* of such deceased person, *where* such party has *acquired* title to the *cause of action immediately* from such deceased person * * *." (Emphasis supplied.)

Clearly neither W. J. Truitt nor Lela Truitt comes within the provisions of this section. They were both competent witnesses and their testimony competent. Devin v. Mitchell, 142 Okl. 233, 286 P. 335, 69 A.L.R. 681; Johnson et al. v. Kimmell, 172 Okl. 315, 44 P.2d 978; Ogle et al. v. Oklahoma City Horse & Mule Com. Co., 173 Okl. 34, 47 P.2d 130.

W. J. Truitt testified that on June 30, 1938, W. D. Henderson offered to make the deed to him and he refused it, and Henderson then said if he did not want the land he would give it to "Miss Lela." Henderson then asked him to take him to the First National Bank at Guymon, which he did. Henderson went into the bank and had Mr. Wright prepare the deed. He then brought Henderson back to their home; Henderson got out of the conveyance and went into the house. A few minutes later he came in and the deed was on the table and Henderson said: "There is the deed over there. You will have to take it and put it on record." Mrs. Truitt handed the deed to him (Truitt) and he later had it placed of record.

Lela Truitt testified that she and Henderson each owned an undivided half interest in the land; that some time prior to June, 1938, Henderson offered to deed her his half interest and said: "Lela, I don't want that land out there anymore and I am not going to have it. It is eating me up in taxes and isn't paying expenses. If you will take it I will give you a deed. I never expect to pay another cent on it." She stated that on June 30, 1938, she was in the house when Mr. Truitt and Henderson returned from Guymon; that at that time "he (Henderson) said: 'Here is that deed,' and handed it to me, 'here is the deed and you will have to put it on record.' Those are the very words he said. He handed it to me and I put it on the table." When asked if she heard any conversation between Truitt and Henderson at that time, she testified: "I heard him say here is that deed, he handed it to me and I put it on the table. He said 'there is the deed I made to Miss Lela'

and then I picked it up off the table and handed it to Truitt, and he told Truitt to put it on record." She further testified that after that time she collected the rents from the land, paid the taxes on it, and Henderson thereafter never at any time indicated he wanted to have or exercise any ownership or control over it, or to have anything to do with it.

Both W. J. Truitt and Lela Truitt denied that there was any such consideration or agreement as contended for by the plaintiffs.

I have carefully considered the correspondence between the parties and find that the letters are unambiguous, and when analyzed, do not shed any light upon the controversy that is in any manner favorable to the plaintiffs. When these letters are considered together with all of the other testimony, the equities appeal to the court as being in favor of the defendants.

Dewey B. Pepper and his sister, Essie Ree Saxon, were distantly related to William D. Henderson, but had never been closely associated with him in any manner. What correspondence they had with him was of a desultory character. They are people of middle age, in good health, bright, alert, and in the full possession of their faculties. They unexpectedly came in contact with these three elderly people, William D. Henderson, W. J. Truitt and Lela Truitt, who had reached their "three score years and ten." The Truitts were broken in health physically, and Henderson was broken in health both physically and mentally. These elderly people had been associated closely for nearly 40 years. Lela Truitt and William D. Henderson, for a period of 40 years, had braved the rigors of the West and gone through the storms of life together. The evidence clearly shows that they looked upon each other as brother and sister. Nature had dealt them both the inevitable blow of the frailties that come with the years and they were sorely troubled. They appealed to the plaintiffs and the contact was made. Within a little more than six months these two plaintiffs came into the full possession of all the personal property of Henderson amounting to over $9,000, and after the expenses of the last illness and funeral of Henderson were paid,.

they realized something over $8,000. This property by Henderson's will had been bequeathed to the Truitts. He had deeded his real estate to Lela Truitt and continued to live at the Truitt home, paying his board by the month. There is nothing unusual in the statement by Lela Truitt in her letter of June 22, 1940, "I have promised Bro. David to look after him and *see that he is taken good care of.*" There is nothing in the statement that would imply that she had made an agreement with him to furnish him a home for life and bear the expenses of his living in consideration for the deed to her of his interest in the jointly owned land. The fact that he never thereafter exercised any ownership over it and continued to pay his board negatives that contention. The plaintiffs contend that both Mr. and Mrs. Truitt stated that if the plaintiffs would take Henderson and care for him, at his decease they would have a "settlement." If such a statement were made, which the defendants deny, it would be a natural one. At that time, by will in 1937, Henderson had bequeathed them all of his estate. There was no good reason to presume that bequest would be changed. But aside from this, the plaintiffs state that Mrs. Truitt assured them Henderson had ample resources to take care of himself, which he had the right to use as he desired during his life, regardless of the will. In the letters of May 23, 1940, written at the direction of Henderson, Mrs. Truitt used these two statements. To the plaintiff Pepper: "He has plenty of money to take care of himself and more too and there is a bunch of folks here that is very anxious to take him to get his money, so we think." And to Mrs. Saxon: "He has plenty of money to take care of himself and more too and there is a bunch of folks here that are very anxious to take him, but they know he has money and are wanting his money so we think."

■ The fact that Henderson changed his will in the latter weeks of his life and made the plaintiffs his beneficiaries, who to all appearances had made a special effort to treat him with extra consideration, does not demonstrate that he had any such agreement with Lela Truitt as the plaintiffs contend here. He apparently had forgotten that he had conveyed the land to Mrs. Truitt at the time the codicil was executed. One cannot escape this conviction when all the facts and circumstances shown by this record are considered.

■ But aside from all of that, even if Henderson had made the agreement contended for by the plaintiffs, according to their own testimony they left Guymon with Henderson on June 12, 1940. The Circuit Court of Appeals has held that the "alleged oral agreement was breached, and the asserted cause of action accrued in June 1940, when Henderson was taken from the Truitt home in Guymon. This suit was brought on June 14, 1945, * * *. If the breach occurred before the 14th of June, more than five years had elapsed when this suit was commenced." Pepper et al. v. Truitt et al., 10 Cir., 158 F.2d 246, 251. The court then quotes from Shell v. Strong, 10 Cir., 151 F.2d 909, 911, which holds "when the suit is brought after the statutory time has elapsed, the burden is on the complainant to aver and prove circumstances making it inequitable to apply laches to his case."

■ Is it equitable to apply laches in the case at Bar? The alleged cause of action accrued on June 12, 1940, and the statute of limitations began to run. Henderson took no action in the matter aside from the execution of the codicil to his will in October, 1940. After his decease these plaintiffs took no action until June 14, 1945, two days after the statute had run its course. The last communication of any kind from either plaintiff was the letter of Mrs. Saxon dated October 27, 1942. The defendants were in ill health and at the date of commencement of the action were in their 75th year of age. It occurs to the court that the utmost diligence was required in this case. The court holds that the plaintiffs were guilty of the grossest kind of laches and equity between the parties forbids a recovery here.

The court finds generally in favor of the defendants. Findings of fact, conclusions of law and a form of judgment consistent with this opinion may be submitted within 15 days of this date.