[ S.F. No.4473.   Department Two.—May 18, 1906.]

In the Matter of the Estate of BERTHA M. DOLBEER, Deceased. ADOLPH SCHANDER, Appellant, v. GEORGE D. GRAY et al., Respondents.

WILLS—CONTEST OF PROBATE—INSANITY OF TESTATRIX—JUDGMENT FOR PROPONENT—REVIEW UPON APPEAL.—Where upon the contest of the probate of a will for alleged insanity of the testatrix the verdict and judgment were for the proponents, if the evidence would support no other verdict the judgment for the proponents will not be disturbed for errors which have not prevented the contestant from making out his case, or for rulings which had they all been in his favor would not have entitled him to a judgment.

ID.—BURDEN UPON CONTESTANT.—The burden was upon the contestant to show affirmatively and by a preponderance of the evidence the insanity of the testatrix, and the evidence is to be considered upon appeal in view of the burden which the law casts upon him.

ID. — NATURALNESS OF WILL — RESIDUARY BEQUEST TO BEST-LOVED FRIEND.—Where it appears that the property of the testatrix was derived from her deceased father, and her deceased mother's relatives were comparative strangers, except a maternal aunt named in the will; and that the contestant was a maternal uncle whom she had never seen, it was not unnatural that she should bestow the bulk of the property upon one who had been her best-loved friend and companion from her girlhood, and whom her deceased father had remembered in his will as a member of the family, and who had been her sole companion since her father's death.

ID.—SOUNDNESS OF MIND SUFFICIENTLY EVIDENCED.—Where the contents of the will, and the acts and conduct of the testatrix in connection with its execution, indicated her soundness of mind, which was confirmed by the testimony of a large number of witnesses who knew her at the time of the execution and prior and subsequent thereto, her soundness of mind and capacity to execute the will were sufficiently evidenced.

ID.—PRESUMPTION OF SANITY—PROOF OF SUBSEQUENT INSANITY.—The presumption is always that a person is sane; and proof of subsequent insanity carries back no presumption of its past existence. It exists only from the time when it is proved to exist.

ID.—INSUFFICIENT PROOF OF INCOMPETENCY—ABSENCE OF CONFLICT.—Where all the direct testimony for the contestant was insufficient to overcome the presumption of the sanity of the testatrix at the time of the execution of the will, and, taken as it must be, in connection with all of the evidence of the sanity of the testatrix at that time, was insufficient to raise any conflict thereupon, it was insufficient to justify the submission to the jury of the question as to her incompetency to make the will.

Id.—Testimony of Medical Experts—Melancholia.—Where the testimony of medical experts introduced for the contestant was based on hypothetical questions which excluded the testimony for the proponent, it would be of the weakest character; and where it was addressed to a form of insanity called melancholia, which led to her death by suicide long after the execution of the will, at the time of which it clearly appears that she was clinging to life, such testimony cannot be said to raise a conflict of evidence upon the question of her sound and disposing mind at that time.

Id.—Evidence—Declarations of Proponent as Devisee.—The court properly excluded testimony offered by the contestant to prove the declarations of one of the proponents of the will as one of the devisees, which it was asserted would have been favorable to the contestant on the issue as to the incompetency of the testatrix.

Id. — Exclusion of Coroners' Inquisitions. — The verdicts of the coroners' inquisitions held in the states of New York and California upon the body of the deceased testatrix were properly excluded from evidence; but even if the ruling had been erroneous, it could not in the state of the evidence have affected the result.

Id. — Hearsay — Facts Learned by Witness for Contestant. — A question asked of a witness for the contestant which included a statement of facts "learned by the witness" in respect to the testatrix was properly excluded, as involving hearsay evidence.

Id.—Evidence of Sanity of Father of Testatrix.—Evidence was admissible to show the sanity of the father of the testatrix during his lifetime, and that he was a man of exceptional mental vigor and business capacity, who by his own efforts had amassed a large fortune. It will not be presumed that a child inherits the insane and not the sane tendencies of her family.

Id.—Testimony of Medical Practitioners—Soundness of Mind of Testatrix.—A medical practitioner, whose experience covered all classes of diseases, mental and physical, requiring medical aid, was qualified to testify as to the soundness of mind of the testatrix, whom he met in Paris subsequent to the execution of the will.

Id.—Non-Expert Witnesses — Hypothetical Questions. — The court properly excluded hypothetical questions put for the contestant to non-expert witnesses who were familiar friends of the deceased, involving facts not testified to by the witnesses. Such a line of inquiry is not admissible even upon cross-examination.

Id.—Cross-Examination—Limitation of Latitude.—Where it affirmatively appears that all reasonable latitude was allowed to the contestant in the cross-examination of witnesses, he was not injured in his right by a further limitation thereof.

Id.—Harmless Exclusion of Deposition.—The exclusion of the deposition of a New York banker, who testified that on the day of the death of the testatrix she drew some money on a letter of credit and handed it to the proponent of the will, and who testified that she was rational, could not have injured the contestant.

ID.—ADMISSIBILITY OF DEPOSITION — ABSENCE OF WITNESS — PROOF.—
A deposition taken for proponent during the trial, of a witness
about to leave the country, which was subsequently offered in
evidence on proof that the witness had left the state two days pre-
viously, was properly admitted; and a deposition for proponent
taken out of the state under section 2024 of the Code of Civil
Procedure was properly admitted without any preliminary proof of
continued absence, or of non-residence of the witness, the burden
being upon contestant to overcome the presumption of continued
absence.

ID.—DEPOSITION OF ·PROPONENT — SUBPŒNA — SURPRISE — REBUTTAL.—
Where before the trial the deposition of a proponent had been
taken by contestant, and she was under subpœna for the contestant
throughout the trial, and she was not called to the stand on either
side, the court properly refused to allow the case to be opened by
contestant to take her testimony on the ground of surprise that
she was not called on the side of proponents; and the deposition
offered in rebuttal was properly excluded as not being in any
sense rebuttal evidence.

ID.—HARMLESS REFUSAL OF INSTRUCTIONS.—The refusal of proper in-
structions offered for the contestant was harmless in view of the
evidence and other instructions given by the court rendering such
refusal unimportant.

ID.—INSTRUCTION AS TO MEDICAL TESTIMONY — HYPOTHETICAL QUES-
TIONS.—An instruction as to medical testimony based on hypo-
thetical questions, which defined a hypothetical question as based
upon facts assumed to be true, and which charges that "the opinion
of the witness must therefore be brought to the test of the facts
in order that you may judge what weight the opinion is entitled
to," was properly given.

ID.—INSTRUCTIONS PROPERLY REFUSED—THEORY OF CASE—SPECIAL AR-
GUMENT.—Instructions for the contestant embodying his theory of
the case, which did not embody the evidence, and which were in
their nature a special argument to the jury under the guise of
instructions, were properly refused.

ID.—DEATH OF APPELLANT AFTER SUBMISSION—NUNC PRO TUNC JUDG-
MENT OF AFFIRMANCE.—Where the appellant died after the sub-
mission of the appeal, and the judgment and order appealed from
are affirmed, the affirmance will be entered *nunc pro tunc* as of
the date of the submission.

APPEAL from a judgment of the Superior Court of the
City and County of San Francisco and from an order deny-
ing a new trial. J. V. Coffey, Judge.

The facts are stated in the opinion of the court.

Albert M. Johnson, and Hiram W. Johnson, for Appellant.

E. S. Pillsbury, and Garret W. McEnerney, for Respondent.

HENSHAW, J.—This is a contest over the admission to probate of the last will of Bertha M. Dolbeer. The contest was instituted by a maternal uncle of deceased upon the sole ground that at the time of the making of the will Bertha Dolbeer had not testamentary capacity, by reason of her insanity. The cause was tried before a jury, which jury rendered a unanimous verdict in favor of the proponents.

Contestant concedes the sufficiency of the evidence to support the verdict of the jury, but urges certain rulings of the court in admitting and rejecting evidence, and in giving and refusing to give instructions to the jury as grounds for reversal. Respondents meet this with the argument that the concession of the appellants that the evidence is sufficient to support the verdict does not go far enough, that in truth the evidence admitted in the case, even considered with all the offered and rejected evidence of contestant, would support no other verdict than that which was given. Proponents, therefore, invoke the application of the rule, well settled, that where the result could not have been different this court will not disturb a judgment for errors which have not prevented a party from making out a case, or for rulings which, had they all been in his favor, still would not have entitled him to a judgment. (*In re Spencer*, 96 Cal. 449, [31 Pac. 453]; *Duffy* v. *Duffy*, 104 Cal. 607, [38 Pac. 443]; *In re Briswalter*, 72 Cal. 107, [13 Pac. 164]; *Chapea Water Co.* v. *Chapman*, 144 Cal. 366, [77 Pac. 990].)

It becomes necessary, therefore, even at some length, to consider the facts presented by the evidence actually received, and then the effect which might have been worked by the admission of rejected evidence or by the exclusion of admitted evidence which was objected to.

The burden was upon the contestant to show affirmatively and by a preponderance of evidence the insanity of the testatrix, and the evidence is to be considered in view of this burden which the law casts upon him. (Code Civ. Proc., sec. 1312; *In re Wilson*, 117 Cal. 262, 270, [49 Pac. 172, 711]; *Estate*

*of Nelson,* 132 Cal. 182, 191, [64 Pac. 294] ; *Estate of Latour,*
140 Cal. 414, [73 Pac. 1070, 74 Pac. 441].)

Bertha M. Dolbeer, at the time of her death, was twenty-
seven years of age. Her parents, John Dolbeer and Harriet
Schander, married in 1872. Of the two children born to
them Bertha alone survived. In 1879, when Bertha was two
years of age, her mother committed suicide by shooting
herself with a pistol. At the time of her death there were
living two brothers and a sister of Mrs. Dolbeer. One of these
brothers is the contestant in this case. From 1879 until the
time of her death, July 9, 1904, the testatrix never saw and
never spoke to either of these uncles, and this contestant knew
her only by sight, because she had been pointed out to him.
Of the two sisters of Mrs. Dolbeer, a daughter of one who
is dead, Ethel Roche, is given ten thousand dollars by Bertha's
will; the other sister is Mrs. Moody, who has three daughters
and one son. Mrs. Moody, her eldest daughter, and her son
never spoke to John Dolbeer, father of Bertha, and he never
spoke to them. They never crossed the threshold of his
home while he lived and never entered the daughter's home
after her father's death. With the other two of Mrs. Moody's
daughters Bertha Dolbeer was on friendly terms. They vis-
ited the Dolbeer home and made various excursions with the
father and daughter. Bertha Dolbeer visited Mrs. Moody's
home and was on terms of casual acquaintance with her, the
son, and the daughter above mentioned. Mrs. Breeden, one
of the daughters with whom she was on terms of friendship
and intimacy, is dead; the other daughter is Mrs. Watson,
whose husband was one of the subscribing witnesses to the
will. To sum up, the next of kin of Bertha Dolbeer at the
time of her death are all maternal relatives, the brothers and
sister of her mother. With the brothers she had no acquaint-
anceship whatever. As to the sister, Mrs. Moody, while Miss.
Dolbeer was a not infrequent visitor to her house, her friend-
ship was wholly for the two daughters, Mrs. Breeden, now
dead, and Mrs. Watson, still living.

John Dolbeer had accumulated a large fortune. By his
will, after numerous bequests and legacies, the major part of
this fortune was given to his only child, Bertha. Her will
disposes of property of a value exceeding one million dollars.

When Bertha Dolbeer was eleven years of age there entered

the Dolbeer home as her preceptress Miss Etta Marion Warren, who from that time on until the death of Miss Dolbeer became and continued to be not alone her preceptress but her intimate and devoted friend and companion. John Dolbeer died in 1902. By his will he left a legacy to Miss Warren, and in his will described her as one "who has been for a number of years and is now a member of my family." John Dolbeer's family at this time, in law, consisted strictly of himself and his daughter Bertha, and this inclusion of Miss Warren as a member of his family is not without its significance.

By the will of Miss Dolbeer the principal portion of her large estate is left to Miss Warren. In her will Miss Dolbeer describes Miss Warren as "my devoted friend," and the record is full of evidences of her affection, of her devotion, and of her gratitude to this lady. She had been her friend, companion, and confidant from her earliest girlhood years. She took Miss Warren's middle name, Marion, and adopted it as her own, calling herself Bertha Marion Dolbeer. She spoke of her always in the most endearing terms. "She was the best friend a girl could have." "Miss Warren had done everything for her in every possible way, and all she hoped was that she could live long enough to pay back in some small way Miss Warren for all her kindness and all her goodness to her." She "did not know what she would do without Miss Warren." "We are like two sisters in one family." "She was the best friend that I ever had in the world, that is, next to my father." "She had been mother, sister and brother" to her. "She was the nearest of kin she had in the world." "She had been with her since she was a little girl and she had always looked out for her." She was "more fortunate in having Miss Warren than any one will ever know." She could "never thank Miss Warren for what she had done for her." She was "the only one who was near or dear to her in all the world." Of these and like expressions the record is full. And against them is to be contrasted the position of this wealthy girl who was, saving for Miss Warren, alone in the world. Alone, not because of any estrangement that had grown up between her and her mother's relatives, but because those relatives had always been strangers to her. I say this that the facts may be shown as they exist, namely, that this is not the case of an "unnatural will" where dependents and

those who had grown accustomed to lean upon the bounty of one are, at the death of that person, without apparent reason, deprived by his will of that bounty. Nor is it a will where relations, intimate in fact as well as in blood, who have had a reasonable basis for their ''expectations'' have been disappointed at the expression of the testator. Miss Dolbeer's will left her property at her death where in life she had loved, and unless it shall be said that the claims of blood dominate and control the testamentary right (in which case the laws of wills should be swept from our statute-books and all property pass under the laws of succession), the will in question was natural in its recognition of the claims of gratitude, affection, and love. Miss Dolbeer's own statements furnish ample recognition of this. Her property had come to her from her father. There had been a complete estrangement between her father and her mother's people. She had never known or cared for these omitted relatives. Moreover, in the making of her own will she had before her a copy of her father's will, and in many of the legacies and bequests she copied the provisions of her father's will with a touching fidelity to what she must have conceived would have been his wishes.

After the death of her father Miss Dolbeer lived in the paternal home with Miss Warren. For the first year after her father's death she led a reasonably secluded life, such trips and visits as she made being made quietly and with due regard for the proprieties. From August, 1903, to March, 1904, she entered actively upon the social life of one of her means and freedom from responsibilities. She attended balls, parties, places of amusement, and made many excursions with her friends into the country. She was fond of outdoor sports and amusements, was an accomplished golf-player and a skilled chauffeuse. There was nothing certainly up to this time in all her life to have suggested that in any way or in the slightest degree she was the victim of insanity. In the spring of 1904 she was somewhat run down in physical health, and under her physician's advice took a period of ten days' rest, during which time she cut herself off from social functions. She was attended by a trained nurse, and her friends visited her at will. She was wholly freed from the doctor's care and supervision several days before she executed the will in question. She executed this will, as she herself states, in

contemplation of her trip to Europe which had been planned for some five or six months. Upon the face of the will, which is holographic, and of considerable length, there is not the slightest evidence of derangement or of unsoundness of mind. She knew that a holographic will did not require the attestation of witnesses, but took the precaution of executing it in the presence of two subscribing witnesses with the formalities required in the case of a will not holographic. On the day the will bears date she went to the office of Douglass Watson, husband of her cousin, Mrs. Watson, above mentioned, requesting him to witness it. This was on Saturday, the twenty-third day of April. On Monday, the twenty-fifth day of April, she took to the office of Dolbeer & Carson, which was also her business office, a sealed envelope indorsed "Last will and testament of Bertha M. Dolbeer." She then took from the office of Dolbeer & Carson a will which she had deposited there a year before. She departed for Europe with Miss Warren, and after her death, which occurred on July 9th of the same year, it was found that the document with Dolbeer & Carson was a copy of her will, at the foot of which was written in her own handwriting: "The foregoing is a copy of my last will and testament, the original of which is in the California Safe Deposit vaults." She thus not only wrote her will, but wrote a copy of it and left that copy in her business office with the attached memorandum showing where the original could be found. More than thirty of her intimate and disinterested friends saw her frequently in the time preceding and shortly before the execution of the will, and all testified to her absolute sanity. Twelve of the witnesses saw her on the day the will was executed and unite in their testimony to her absolute sanity. Nearly twenty witnesses saw her between the date of the execution of the will, April 23d, and April 27th, when she departed for Europe, and they bear the same testimony to her sanity. Many witnesses saw her after she left San Francisco, in Chicago, in New York, on the steamer, in London, and in Paris, on the return voyage, and again in New York, where she met her death, and they bear like evidence to her sanity. The internal evidence of the writing itself is of a sound and disposing mind. The reason why Miss Warren is the principal beneficiary of her bounty is convincingly shown by Miss Dolbeer's own

statements, and in particular by her explanation that her
money had come to her from her father and that her mother's
relatives were not on speaking terms with her father.   No
writing before the execution of the will and down to the
time of her death (and besides the will itself there were
ten or twelve of her letters introduced in evidence) bears the
slightest testimony to any mental unsoundness.   To the con-
trary, they are precisely such letters as it might be expected
she would write.   Moreover, it is not pretended that Miss
Dolbeer was the victim of any hallucinations, that any of
her friendships had changed to antipathies, or that prac-
tically to the very day of her death her life had not always
run smoothly along its regular current.

Where, then, is to be found the evidence that Miss Dolbeer,
upon the 23d day of April, 1904, was, within the meaning
of the law, insane so as to be incapable of the testamentary
act?   It rests upon this: Contestant endeavored to show that
Mrs. Dolbeer, mother of Bertha, was insane during the period
of gestation of her unborn child and after its birth, and
committed suicide by reason of this insanity; that there was
insanity in her father's family (though it is not pretended
that her father was insane), and that Bertha Dolbeer herself
committed suicide by leaping from a window in the Waldorf-
Astoria hotel, and that she so committed suicide because she
was insane.   But without pausing to analyze the insufficiency
of the evidence to establish several of these propositions, but
to the contrary conceding that everything which appellant
contends for has been shown by this evidence, it proves
nothing more at most than that Bertha Dolbeer, in New
York, upon the ninth day of July, 1904, committed suicide
because of her insanity.   The presumption always is that
a person is sane.   Proof of insanity carries back no pre-
sumption of its past existence.   It exists only from the time
when it is proved to exist, and thus I say that, resolving
every disputed point as to the weight of the evidence in
contestant's favor, the utmost which that evidence by any
stretch of liberality can be said to establish is that the
deceased had a hereditary taint of insanity in her blood which
declared itself for the first time upon the day of her death
and prompted her to commit suicide.   That up to the day
of her death she had led the sane, normal life of a girl of her

wealth and station, that her last will and testament bears
every evidence of sanity and none of insanity, and that if
she had died poor instead of wealthy no one would have
dreamed of saying that up to the day of her death she had
ever displayed the slightest symptom of mental derangement,
much less an insanity which would deny her the legal right
to make her will.

In making the foregoing statement we have not overlooked
the testimony which contestant offered of certain intimate
acquaintances of the deceased concerning her unsoundness
of mind. The Code of Civil Procedure (sec. 1870) permits
in evidence the opinion of an intimate acquaintance respect-
ing the mental sanity of a person, but with that opinion
must be given the reasons upon which it is based, and the
opinion itself can have no weight other than that which the
reasons bring to its support. (*Kinne* v. *Kinne,* 9 Conn. 102,
[21 Am. Dec. 732] ; *Brashears* v. *Orme,* 93 Ind. 442, [49 Atl.
620] ; *Prentis* v. *Bales,* 93 Mich 234, [53 N. W. 153].) These
witnesses were but three in number, and all of them interested
witnesses,—Mrs. Moody, the aunt of Miss Dolbeer and one
of her next of kin in case of intestacy; Mrs. Moody's daughter,
Mrs. Edna Moody Sherman, whose interest through her
mother would be both pecuniary and direct; and Elizabeth
C. Phillips, an elderly lady and the cousin of Bertha Dolbeer's
father. Mrs. Phillips had been left a legacy of ten thousand
dollars, with the amount of which she was frankly and
avowedly dissatisfied. She likewise objected to the fact that
in the disposition of her bounty Bertha had remembered
certain people, and in particular she resented the circumstance
that Mrs. Warren, mother of Miss Warren, received twenty-
five thousand dollars by the will, while she herself received
only ten thousand dollars. She denies any arrangement be-
tween herself and the contestant whereby in the event of
the will being declared invalid she was to receive an equal
sum or more, but she testifies that she haunted Mr. Gray, one
of the executors under the will, ''for days and weeks to beg
for a compromise that I might not be placed on the stand
to state what I have done.'' She testifies further that all
she had gotten in the world was gone and lost, there was only
her husband left, and ''all she cared for was money.'' She
says that she ''did not want Mr. Brown to have $10,000 in

that way. I did not want Mr. Mugan to have $20,000. I did
not want Miss Warren's mother to have $25,000, I certainly
ought to have had as much as that." As to Mrs. Moody and
Mrs. Edna Sherman, besides their pecuniary interest if the
will should be declared invalid, they were not remembered
in it. So much for the attitude of these witnesses.

Coming to their testimony, Mrs. Phillips says she met Miss
Dolbeer on April 25, 1904, and declares: "I don't think
Bertha was of sound mind in April, 1904." She says "she
acted as though she was under a spell, unsettled, as if she
had no opinion of her own, as though she did not know what
she wanted to do. She looked very poorly and was very thin.
She told me she had been subject to fits of depression." On
cross-examination, when pressed for her reasons for her opin-
ion, she says that, in talking of the sudden seizure of her father
in New York just before his death, "she showed more excite-
ment and nervousness than she had ever displayed before.
She said: 'I shall never forget it, Auntie, I shall never forget
it. His struggle for breath, for life. I will never forget
it.' She clasped her hands together in a distressed manner."
Surely the natural feelings of a daughter over the agonizing
scene of her father's sufferings to which she was a witness
will not be held evidence of insanity. It would have been
more pertinent to the issue if the girl had not shown distress.
The witness proceeds that "she complained of a pain in her
head. She had headache, nervous sleeplessness, pain in her
eyes." The pain was "in the back of her head," and her
mother's pain was in the back of her head. She could not
sleep, and her mother was afflicted with insomnia. When
Mrs. Phillips tells her that, in her judgment, she is not fit
to go away, Bertha responded, "I have to go. I have to go,"
and when pressed further on the subject explained that "she
had already engaged her steamer apartment." Her manner
was as though she did not care for anything, any pleasure.
She said she thought the trip on the water might benefit her,
and she might be able to sleep if she was on the water. She
told her aunt that "when one is not well life is not worth
living. There is no pleasure in life without health," and
her manner during that conversation was depressed. Again,
the witness advised her to go to Mrs. Nordingham, the wit-
ness's physician for rheumatism, "and," proceeds the witness,

"she promised me she would go. She promised me really she would go. I said I would go for her. She said, 'No, I will surely go, Auntie.' Well, she did not go. It was something that she never made me a promise for anything that she did not keep." She sums up as follows: "It was various little things which impressed me that perhaps I should not worry, but I am satisfied that she was not—her physical health and the mental health would not enable her—well, say, to make that will, I thought, and I was fully satisfied from her manner · that she was not responsible, that she was irresponsible." The generalities in which this witness clothes her reasons, the utter inadequacy of the reasons themselves, her naïve declaration that Miss Dolbeer's physical and mental condition would not enable her "well, say to make that will," make this witness's opinion of no probative value in the case.

Mrs. Sherman did not testify to her opinion of the mental soundness or unsoundness of Miss Dolbeer, nor did she testify to a single irrational act. Her evidence was to the effect that Miss Dolbeer was never very enthusiastic or demonstrative, that on the Sunday before her departure, which was shortly after the making of the will, she was not in very good health, and that she was "more indifferent upon that day than she had ever seen her before." She did not display any enthusiasm when offered letters of introduction to people "who lived in an out of the way place," but, to the contrary, she told the witness that she did not expect to do much traveling during her sojourn in Europe, but would remain most of the time in or about Paris. There is no word of this testimony going to the mental unsoundness of the testator, and nothing (having regard to the presumption of sanity) inconsistent with the established fact that at this time Miss Dolbeer's physical health was not good, and that she was going to Paris for the sea-voyage and for rest and recuperation there. It is not only not surprising but quite natural that her physical ailment should have produced a certain amount of mental depression, and there is much of sound wisdom and nothing of insanity in the girl's declaration that there is no pleasure in life without health.

Mrs. Moody's testimony was to the effect that Miss Dolbeer was of somewhat phlegmatic temperament and displayed little enthusiasm over things, was never wasteful, but rather

economical, and had always been accustomed to the luxuries of wealth. The acquisition of her father's estate did not seem to unbalance her in any way or make her giddy or different from what she had been. She was like a great many daughters who are humored and spoiled: not particularly fond of study, not interested in anything very much; a person of ordinarily good education, about the average of young women; a young lady of good sense, as far as the witness knew; a young lady of fastidious propriety and careful of her good name. Miss Dolbeer was at the house of the witness on the Sunday before her departure, to say good-by. That was April 24th, the day after the execution of the will. She did not talk much of her trip, "for she did not seem to know exactly what she intended to do; she only seemed to know she was going. She did not seem to have any plans." There was surely nothing surprising in this, in view of the fact that Miss Dolbeer was going, as has been said, for the sea-voyage and for rest and recuperation in Paris. The witness testified that before this day she had not observed anything wrong in Miss Dolbeer's mental condition, except that she was very much depressed at times, and she proceeds: "There was nothing unusual in what she said that I know of. There was nothing said that could be taken as unusual. I know she was not well by a good deal, and I know that from an episode that happened at the house. I asked her to come to dinner the following Monday and after a while she said she must go. I asked her to stay longer. She said no, she had some business to attend to. Before that she had exhibited signs of mental distress, which were quite visible, very plain to be seen. She was sitting there after luncheon, upstairs in the library. Suddenly she grasped herself like this (indicating by putting her arms across her stomach), in a tragic manner. I was quite startled, and I asked her if I could get her some little remedy to help her. I said, 'Perhaps you have eaten something,' and a look of great terror came over her face. She did not say she had a pain in her stomach. She said, 'Oh, my stomach.' The look in her eyes was dreadful. She looked terribly frightened and shook all over this way (indicating by shaking herself). She clasped herself convulsively. Her face was one of terror, perfect terror, as though something dreadful had happened. She was terribly frightened at something, and the look of

terror was so great that it frightened me. I collected myself
and tried to quiet her thoughts and turn them into another
channel. I asked her something about her trip, and she threw
herself back in her chair and let her arms fall, as though she
was exhausted and had no strength.

"Q. How long did this expression of pain seem to last?

"A. I do not think it was an expression of pain.

"Q. Well, the expression which you have described.

"A. Only a very few seconds. I couldn't tell. I simply
changed the subject.

"Q. Was there any more than the one expression.

"A. No; we talked a little more about her trip. I offered
to give her letters of introduction to friends in Paris. She
said, 'Yes, that would be nice.' Then she started after a
while to go home, and I saw her down to the front door.
I stayed on the porch, and as she was going I said, 'When
you get to Paris, write and tell us about the fashions,' just
for something light to say. She turned around and gave me
the most pitiful look I have ever seen on anyone's face—
a haunted look of fear, as though she had something on her
mind; she turned her face and looked at me; then she seemed
to lose herself and went on down the stairs.

*"I came in and said to my daughter, 'I never shall forget
Bertha's look as she was going away. I know that her mind
was not right. I am perfectly convinced of it.'"* . . .

"I offered to give her a little bicarbonate of soda. I thought
if it was her stomach it might help a little. She seemed so
terrified. When I offered it to her this dreadful look of care
was on her face, and she was holding herself in that position,
grasping herself in that manner, and said 'No, no, no.' I saw
that she was terrified at something and I turned the subject
of conversation."

She testifies further that, excepting for this episode during
the two hours that Miss Dolbeer was there, the conversation
was upon ordinary subjects such as would interest young
ladies, "matters of society, what was going on in society."
The opinion of this witness is entirely inadequate, when the
reasons for it are considered, to form any foundation for a
judgment of insanity against this testatrix. She had neither
done nor said any irrational thing. She had shown a lack of
interest toward the offer of letters of introduction to people

in out of the way places, which was not unnatural, considering that she had no expectation of visiting those places, and was going abroad for rest. She had a pain in the stomach of such nature that the witness thought it could be relieved by bicarbonate of soda, and the expression upon the face which would naturally accompany this pain the witness describes as a look of fear. This testimony itself is of a condition existing after the making of the will, but if it were on the very day of the making of the will and at the moment of and as a part of the testamentary act itself, it does not amount even to a scintilla of evidence in support of the appellant's contention. It is significant that in all Miss Dolbeer's life she had done nothing, said nothing to prompt Mrs. Moody to give a thought to her mental condition (so the lady testifies) until that Sunday, which was the day after the making of the will which omitted recognition of the witness. And in this connection we have Mrs. Moody's own words: "She certainly did not make a just will. I don't think that the tie of friendship was great enough—of course I don't know—that is just my supposition; that the tie of friendship was certainly not great enough as to leave the bulk to one person."

In the quotation from Mrs. Moody's testimony above given have been inserted certain words in italics which by order of the court were stricken out. We have considered the evidence as though these words had been admitted. They were properly excluded, however, as a volunteer declaration of the witness of her statement to her daughter.

The only other witnesses to Miss Dolbeer's mental condition had but a casual acquaintance with her, which acquaintance arose some two months after the making of the will, and while she was returning upon the steamer to New York—the steward and stewardess of the ship. The steward "noticed" that Miss Dolbeer was looking a little sad. There was nothing else peculiar about her, except that she was sometimes sitting as if she was in deep thought, as if she was thinking about something. "I do not think it was anything different than what anybody else would look that was sad or deep in thought upon a thing." "I did not notice any physical ailment of Miss Dolbeer while she was under my observation, while she was on board the ship. I did not notice anything peculiar about the eyes of Miss Dolbeer, only what I have told you, the

CXLIX Cal.—16

expression. She was thinking about things, looked as if she was staring out before her." "There was nothing unusual about her conduct. They [Miss Dolbeer and Miss Warren] acted the same as any other passengers on board the ship." "I could not see her in any way different from other people." "My idea was that she had lost somebody of her relatives or something; that some one had died, or something like that." "I think I only spoke to her and the passengers, just when the passengers came upstairs and came out on the deck, we say, 'It is fine weather,' or something. And in this conversation with Miss Dolbeer on deck respecting the weather and other current events, I think she acted the same as any other passenger." The stewardess testified: "There was a strange looking in Miss Dolbeer's eyes. In German, I would describe it as 'ein starr blick.' Probably in English you would say staring." "She looked to me nervous, very nervous." "I have seen many other passengers when they are about to take a trip across the great Atlantic, look nervous, especially ladies, especially on the first day. Her general appearance was about the same as a great many other lady passengers whom I have seen on the first day. There was nothing unusual about her appearance to attract my attention in any way."

"Q. How differently did she appear than any lady or many other ladies, to you, who had been passengers on that ship?"

"A. She did not; but you know sometimes a person looks strange to you and you cannot tell what it is. I had never seen her before, and I don't know what her appearance was before then."

This, then, constitutes all of the direct testimony of mental unsoundness. If it stood alone it would in no wise suffice to countervail against the presumption of sanity, but taken, as it is to be taken, with all the evidence of the girl's life and conduct and acts, from her own writings, from her own words, from the lips of dozens of intimate friends, disinterested witnesses and medical experts, it was absolutely insufficient to raise a conflict, it was absolutely insufficient to have justified the submission of the question of her mental competency to a jury.

In addition to this direct testimony, contestant offered three physicians, no one of whom had known Miss Dolbeer in her lifetime, and to whom were given long hypothetical questions

purporting to array the facts in the case,—the insanity of Miss Dolbeer's mother during her pregnancy and afterwards until her suicide two years later, the insanity upon her father's side, the facts of Miss Dolbeer's life, her mental and emotional characteristics, and her death by suicide. These three medical experts in answer to these long hypothetical questions replied that, upon the assumption of the truth of the facts stated, they were of the opinion that "at the time of her death" Miss Dolbeer was of unsound mind and suffering from a form of insanity known to medical science as "simple melancholia." The witnesses were skilled alienists, it may be conceded, but the evidence thus adduced of one who has never seen the person and who bases his opinion upon the facts given in a hypothetical question is evidence the weakest and most unsatisfactory. Such questions themselves are always framed with great particularity to meet the views of the side which presents the expert. They always eliminate from consideration the countervailing evidence which may be of a thousand-fold more strength than the evidence upon which the question is based. They are astutely drawn, and drawn for a purpose, and that purpose never is the presentation of all the evidence. It is never to present the fair and accurate view, but the purpose always is to frame a question such that the answer will announce a predetermined result. This kind of expert testimony, given under such circumstances, even the testimony of able and disinterested witnesses, as no doubt these were, is in the eye of the law of steadily decreasing value. The remedy can only come when the state shall provide that the courts and not the litigants shall call a disinterested body or board of experts who shall review the whole situation and then give their opinion with their reasons therefor to the court and jury regardless of the consequences to either litigant. So and so only can it be hoped to remove the estimate of infirmity which attaches at the present time to this kind of evidence. In the case at bar the hypothetical question presented to these experts eliminated all the facts overwhelmingly proved in favor of Miss Dolbeer's sanity, bore with emphasis upon and threw into prominence trifling circumstances, and contained many statements not justly borne out by the evidence itself. It thus presented a portrait of Miss Dolbeer's life and mind absolutely lacking in vraisem-

blance. All perspective was eliminated, all proportion de-stroyed, and the picture was as untrue to the original as is a fantastic and distorted shadow cast by a flickering and un-certain light a false portrayal of the reflected object.

But, aside from all this, two other facts render this testi-mony of no probative value: The first, that the witnesses testified as to the condition of mind of Miss Dolbeer "at the time of her death," and, as has previously been stated, it may be conceded that her death was self-inflicted and caused by simple melancholia, but this would show no more than that she was insane upon that date, and could not have the effect of proving her insane several months before, when she made her will. Saving in the case of one born a maniac or insane, there must always be a time when a person is rational and of sound mind before the dread disease exhibits itself, and if Miss Dolbeer was insane upon the day of her death, the evidence fails to disclose that her mental incompetency to make a will arose before that day. Second, the testimony of the physicians is that the form of insanity from which Miss Dol-beer suffered was "simple melancholia," and the character-istics of this kind of insanity are explained at length. Some of its pronounced characteristics are an indifference to life and to worldly interests and affairs. As it develops, delusions will develop, but of a very mild nature; the victim is de-pressed, the usual outcome is a suicidal tendency, but the intelligence is either unimpaired or slightly impaired, and one afflicted with simple melancholia would converse apparently rationally, would write apparently intelligently, and would converse with friends or acquaintances so that the affliction would not be noticeable. The main condition is a change in the emotions and disposition. "The desire for life which is natural to most individuals becomes a desire for death. The people that they have loved formerly they grow indifferent to. They often cling to one individual." Assuming that all these attributes and characteristics of simple melancholia were pres-ent in Miss Dolbeer at the time that she made her will (though they were not), still there is nothing in this to establish the legal incapacity to dispose of her property. This insanity and these delusions must be shown to have directly affected the testamentary act. But the truth is Miss Dolbeer had not shown any change in disposition other than a change which

might be natural because of her debilitated state of physical health. She had shown no desire for death, but on the contrary a very earnest desire for life and health, since she had taken a "rest cure" and was going abroad for the very purpose of building herself up. She had not grown indifferent to anybody whom she had formerly loved, and while in truth she did cling to one individual, Miss Warren, that was an individual to whom she had clung with a mixed feeling of sisterly and daughterly love since she was eleven years of age.

For all these reasons, therefore, the testimony of contestant's medical experts cannot be said to raise even a conflict of the evidence upon the question of the sound and disposing mind of Bertha Dolbeer at the time she executed her will.

The code declares that evidence is deemed satisfactory which ordinarily produces moral certainty or conviction in an unprejudiced mind. "Such evidence alone," it adds, "will justify a verdict." (Code Civ. Proc., sec. 1835.) One would indeed be presumptuous to say that the evidence contestant offered was "satisfactory."

As a result of this survey, the evidence admitted being such as to establish the fact that contestant wholly failed to make out a case, the rulings of the court are to be considered, in the light of this conclusion, and such rulings only need be considered, therefore, as contestant insists either prevented him from making out a better case, or unjustly, by the admission of improper evidence, assisted the proponents.

It is contended that the court erred in refusing to admit the declarations of Etta Marion Warren, which declarations, it is asserted, would have been favorable to contestant. Upon the admissibility of such evidence there is a contrariety of opinion in the decisions of our sister states. In *Estate of Arnold*, 147 Cal. 583, [82 Pac. 252], the question was before this court, but was not decided, but the great weight of both reason and authority is against the admission of the declaration of one legatee or devisee when mental incapacity is in issue. One of the vital reasons for this is that the interests of legatees and devisees under a will are several and not joint; each claims independently of the other, and it would be unjust under these circumstances to allow the interest of one to be affected by the acts and declarations of another with whom he is not in privity. And for very obvious reasons

the declaration cannot be admitted against the individual legatee or devisee who makes them, where the mental incapacity of the testator is the question in issue. If the testator did not have mental capacity to devise or bequeath as to one, he had no more capacity to do so as to another, and it has been held in this state, as of course it must be held, that the statute not only makes no provision by which a portion of a will can be admitted to probate, and probate denied to the remainder (*Estate of Pforr*, 144 Cal. 121, [77 Pac. 825]), but, further, that a will cannot be annulled in part; it must be annulled in its entirety or not at all. (*Estate of Froude*, 73 Cal. 555, [15 Pac. 135].) The industry of counsel discloses that in seventeen of our states such declarations are held inadmissible, and in only three states (Georgia, Kentucky, and South Carolina) are they held admissible, while in two states (South Carolina and Tennessee) there are conflicting decisions. The most recent case is *Feathergill* v. *Feathergill* (Iowa), 105 N. W. 377, and upon the same subject may be cited *Roberts* v. *Trawick*, 13 Ala. 68; *Appeal of Dale*, 57 Conn. 127, [17 Atl. 757]; *Campbell* v. *Campbell*, 138 Ill. 612, [28 N. E. 1080]; *Phelps* v. *Hartwell*, 1 Mass. 71; *McConnell* v. *Wildes*, 153 Mass. 487, [26 N. E. 1114]; *Hayes* v. *Burkam*, 67 Ind. 359; *In re Ames' Will*, 51 Iowa, 596, [2 N. W. 408]; *O'Connor* v. *Madison*, 98 Mich. 183, [57 N. W. 105]; *Prewett* v. *Coopwood*, 30 Miss. 369; *Schierbaum* v. *Schemme*, 157 Mo. 1, [80 Am. St. Rep. 604, 57 S. W. 526]; *Carpenter* v. *Hatch*, 64 N. H. 573, [15 Atl. 219]; *In re Vandawalker's Will*, 63 App. Div. 550, [71 N. Y. Supp. 705]; *Matter of Baird* 47 Hun, 77; *Stull* v. *Stull* (Neb.), 96 N. W. 196; *Thompson* v. *Thompson*, 13 Ohio St. 356; *Nussear* v. *Arnold*, 13 Serg. & R. 323; *Mullins* v. *Lyles*, 1 Swan (Tenn.) 337; *Whitelaw* v. *Whitelaw*, 96 Va. 712, [32 S. E. 458]; *Forney* v. *Ferrell*, 4 W. Va. 729. The ruling was therefore proper.

The court was correct in excluding the verdict of the coroner's inquisition upon the body of Mrs. Dolbeer in California, and also that upon the body of Miss Dolbeer in New York, but even had the rulings been error, the result, for reasons already stated, could not have been affected. It has been expressly decided in this state that a verdict of a coroner's jury is not admissible in such a case as this, (*Hollister* v. *Cordero*, 76 Cal. 649, [18 Pac. 855]; *Rowe* v. *Such*, 134 Cal.

576, [66 Pac. 862, 67 Pac. 760]; *Oppenheimer* v. *Clunie,*
142 Cal. 313, [75 Pac. 899].)   And, indeed, the great weight
of authority elsewhere supports this view.   (*Germania Ins.
Co.* v. *Ross-Lewin,* 24 Colo. 43, [65 Am. St. Rep. 215, 51 Pac.
488]; *Central R. R. Co.* v. *Moore,* 61 Ga. 151; *State* v. *Com-
missioners,* 54 Md. 426; *Goldschmidt* v. *Mutual Life Ins. Co.,*
102 N. Y. 486, [7 N. E. 408]; *Aetna Life Ins. Co.* v. *Milward,*
26 Ky. Law Rep. 589, [82 S. W. 364]; *Wasey* v. *Travelers'
Ins. Co.,* 126 Mich. 119, [85 N. W. 459]; *Kane* v. *Maccabees*
113 Mo. App. 104, [87 S. W. 547]; *Life Ins. Co.* v.
*Schmidt,* 40 Ohio St. 112; *Cox* v. *Royal Tribe,* 42 Or. 365,
[95 Am. St. Rep. 752, 71 Pac. 73]; *Chambers* v. *Modern
Woodmen* (S. D.), 99 N. W. 1107; *Whitehurst* v. *Common-
wealth,* 79 Va. 556.)

The court sustained an objection to questions asked by con-
testant of Mrs. Moody.   These questions were: "Taking all
the facts you have learned in respect to Miss Dolbeer, together
with the events of the Sunday just before she went East,
and from your knowledge of what you observed of her on
that day, your opinion is that on that day she was not of
sound mind?"   The second question framed along similar
lines was: "Now, Mrs. Moody, from what you observed on
the Sunday before her departure, and what you had learned,
and what you knew of Miss Dolbeer, and what you had
observed, her actions and conduct, and language, all taken
together, massing all that knowledge in your mind, was she
of sound mind the day she visited you?"   Both questions
are subject to the same objection that they permit the witness
to testify upon hearsay information,—"from what she had
learned."   There can be no difference in principle between
this question and one which calls for the opinion of the witness
based upon what he may have heard.   And it has been repeat-
edly held that to allow a witness to testify upon knowledge
or information thus received is error.   (*People* v. *Wreden,*
59 Cal. 392; *Xenia Bank* v. *Stewart,* 114 U. S. 224, [5 Sup.
Ct. 845]; *Flanagan* v. *State,* 106 Ga. 109, [32 S. E. 80];
*Kehrig* v. *Peters,* 41 Mich. 475, [2 N. W. 801].)

Evidence was offered and admitted over objection showing
that John Dolbeer, father of Bertha, not only never showed
any trace of insanity in his lifetime, but was a man of some-
what exceptional mental vigor and business capacity, who by

his own efforts amassed a large fortune. This evidence was properly admitted. The contention of contestant was that Bertha Dolbeer was the victim of hereditary insanity, and that the taint was in the blood of Bertha, from her mother's and her father's people. Even though no effort was made upon the part of contestant to show that her father had been insane, it was perfectly proper to put before the jury the fact that her immediate paternal progenitor was not only not insane, but was of exceptional mental power and had borne a prominent part in the active affairs of business life. As said in *Estate of Redfield,* 116 Cal. 637, [48 Pac. 794], it will not be presumed that a child inherits the insane and not the sane tendencies of her family.

Dr. Hertzstein, a skilled medical man, had met Miss Dolbeer in Paris upon her last visit there. He had met her socially at a dinner party. He qualified as an expert, his experience covering all classes of diseases, mental and physical, requiring medicinal or surgical aid. He was asked the opinion whether, upon the occasion when he met Miss Dolbeer, she was of sound mind, and answered, over objection, that she was. A general practitioner who has had experience in the various kinds of mental afflictions is as competent to testify to the sanity or insanity of a person as the skilled expert who devotes his entire time to the study of such diseases. (Wigmore on Evidence, secs. 569, 687; *Estate of Toomes,* 54 Cal. 515, [35 Am. Rep. 83] ; *Davis* v. *State,* 35 Ind. 497, [9 Am. Rep. 760] ; *Phelps* v. *Commonwealth,* 17 Ky. Law Rep. 706, [32 S. W. 470] ; *Abbott* v. *Commonwealth,* 107 Ky. 624, [55 S. W. 196]. Without multiplying authorities upon this proposition, it is sufficient to refer to the Encyclopedia of Law (2d ed., vol. 12, p. 452), which shows this to be the rule not only in the courts of the United States, but in twenty and more state courts whose cases are there cited.

Hypothetical questions involving facts not testified to by the witnesses themselves were put by contestant to certain nonexpert witnesses, familiar friends of the deceased, and by the court were ruled out. These rulings were proper. No case has been cited which allows such a line of inquiry, even upon cross-examination, and as to the impropriety of such questions reference may be made to *Rambler* v. *Tryon,* 5 Serg. & R. 90, [10 Am. Dec. 444] ; *Hogmire's Appeal,* 108

Mich. 410, [66 N. W. 327]; *Dunham's Appeal,* 27 Conn. 192;
*Pittard* v. *Foster,* 12 Ill. App. 132; *Ragland* v. *State,* 125
Ala. 12, [27 South. 983]; *Appleby* v. *Brock,* 76 Mo. 314;
*Bell* v. *McMaster,* 29 Hun, 272; *St. Louis Mut. Life Ins. Co.*
v. *Graves,* 6 Bush, 268.

It is not perceived that the contestant suffered in any of
his rights by the alleged improper limitation upon the cross-
examination of certain of proponent's witnesses.    To the
contrary, it affirmatively appears that every reasonable lati-
tude, and in some instances even a most liberal latitude,
was allowed in this regard.

The exclusion of the deposition of Theodore Rumney under
proponents' objection was not error, and from no point of
view, if error, could the ruling have been injurious to con-
testant.    Mr. Rumney was a New York banker.    In his
deposition he testified that Miss Dolbeer and Miss Warren
called at his office on July 9, 1904, the day of Miss Dolbeer's
death; that she drew some money on a letter of credit which
she had with her and handed the money to Miss Warren.
Mr. Rumney testified repeatedly that on that occasion Miss
Dolbeer's appearance was rational and that she acted in a
rational manner, and that "it never entered his head to
think she was other than rational." On cross-examination,
when asked whether at any subsequent time he had any sus-
picion of the fact that Miss Dolbeer was irrational, he an-
swered: "Not that she was irrational, that did not. . . . She
was rational, but after I had read the evening paper [con-
taining an account of her death], it seemed to me in thinking
it over that she was in a tense mood, never irrational."

The court did not err in receiving in evidence the deposi-
tion of Fred A. Greenwood.    The appellant's objection to
this was that the deposition was taken on November 11, 1904,
during the trial which commenced on November 2, 1904.    It
was read in evidence on December 7th and 8th, on proof that
the witness had left the state two days before,—namely on
December 5, 1904,—and was then absent.    The proposition
urged by counsel is that the proponents should have called
the witness because he was in the state during the progress
of the trial.    The sections of the code covering the subject are
as follows:—

"The testimony of a witness in this state may be taken by

a deposition. . . . (3) When the witness is about to leave the county where the case is to be tried and will probably continue absent when the testimony is required." (Code Civ. Proc., sec. 2021.)

" . . . If the deposition be taken under subdivisions 2, 3, and 4, of sections 2021, proof must be made at the trial that the witness continues absent or infirm, or is dead." (Code Civ. Proc., sec. 2032.)

This section contemplates that a deposition may be taken when it is believed that the witness will be absent not during any part of the trial, but when his testimony is "required," and the only additional requirement of the code is that the witness shall be absent when the deposition is used. It was not even shown that proponents had knowledge that deponent Greenwood was in the county during the progress of the trial, and, as said in *Abless* v. *Miller,* 12 Tex. 111, [62 Am. Dec. 520], if the deposition is legally taken it is admissible, and "it would be unreasonable to require a party to keep an eye on the witness after his testimony had been taken and to make it his duty to put the witness under subpoena should he move into the county."

Nor was it error for the court to admit in evidence the deposition of Miss Ethel Postley. This deposition was taken in New York on the twenty-eighth day of October under the provisions of section 2024 of the Code of Civil Procedure. To permit its introduction in evidence no preliminary proof was required to be made under the provisions of section 2032 of the Code of Civil Procedure, since that section applies only to depositions taken in the state. To take a deposition under section 2024 it is not necessary that the witness be a nonresident. The question of the witness's residence is not involved. All that is required is that the witness be out of the state. It was therefore not incumbent upon the proponents to show her continued absence at the time her deposition was offered. The presumption existed that the witness having been shown to have been absent, that her absence continued, and it was upon the party objecting to prove the contrary. (*Randolph* v. *Woodstock,* 35 Vt. 291; *Hennessy* v. *Niagara Fire Ins. Co.,* 8 Wash. 91, [40 Am. St. Rep. 892, 35 Pac. 585]; *Gaul* v. *Wenger,* 19 Mo. 541; *Brower* v. *Beckwith,* 35 Miss. 467.) This proof was not made by the contestant. The only

testimony upon the subject was that by Mr. McEnerney, who stated merely that he had been informed that the witness was in San Francisco, but had been unable to subpœna her. Mr. McEnerney's information upon this matter is not the measure of the prooof contemplated by the law.

The deposition of Miss Warren had been taken by the contestants, and she had been examined at great length and with much particularity. She was under subpœna by contestant throughout the trial of the cause. Contestant did not call her to the witness-stand, nor did proponents. At the conclusion of the taking of proponents' evidence contestant sought to have the court open the case for the taking of Miss Warren's testimony, upon the ground of surprise, their expectation being that proponents would call her as a witness, and failing in this they sought to have her deposition admitted as rebuttal evidence. His motions addressed to these ends were denied by the court, and there was no error in these rulings. The sole issue in the case was the mental incompetency of the deceased. Upon this contestant had the burden and was required first to introduce his evidence. What Miss Warren would testify to was known to him from the deposition which he had taken, and she was present in the courtroom in obedience to his subpœna. If he failed to present the testimony of a witness, which testimony would have been valuable to this cause, under these circumstances, the responsibility for this failure must rest with him, for it cannot be said that there was any abuse of the discretion of the court in refusing to allow the case to be reopened for this purpose. As to the proffer of the deposition by way of rebuttal testimony, it was properly excluded as being in no sense rebuttal.

Exception is taken to the rulings of the court in giving and refusing to give instructions. It may be said that generally the complaint is not that the instructions actually given were erroneous, but that the instructions proposed by the contestant, being unimpeachable in point of law, should have been given. In some instances there is merit in this contention of appellant. This is true of the proposed instruction as follows: ''The jury are instructed that the fact that the testatrix committed suicide, if the jury shall find that she did commit suicide, is not of itself sufficient evidence of unsoundness of mind; but this is proper to be considered upon the question

of the mental condition of the testatrix, and if the jury find that Bertha M. Dolbeer did commit suicide, they may take that fact into consideration in determining whether or not she was of sound mind at the time of the making of the will in question.'' Nevertheless, it cannot be said that the refusal of the court to give this instruction and others which may be considered to stand in like position affords substantial ground for reversal of the case. In the first place, it certainly may be presumed that when the court admitted evidence tending to show that Miss Dolbeer committed suicide the jury understood that it was to be considered by them as evidence bearing upon the question of her mental capacity at the time of the making of the will. Moreover, the jury was instructed that they were to consider all the evidence in the case in determining this question, and, finally, since, as has been said, the evidence in the case would not have warranted any other conclusion than that which the jury reached, the refusal to give these instructions becomes unimportant, and the objections entirely lack the significance which would attach if the case had been in any sense a close or doubtful one.

The court, at the request of the proponents, instructed the jury as follows: ''A hypothetical question is a question which assumes a certain condition of things to be true, a certain number of facts proved or to be proved, and calls upon the witness to assume all the material facts stated to be true and express his opinion as to a certain condition. The witness to whom the hypothetical question is addressed assumes them to be true, and bases his answer upon the assumed case. The opinion of the witness must, therefore, be brought to the test of the facts in order that you may judge what weight the opinion is entitled to.'' Appellant concedes that this instruction ''may be true as an abstract proposition of law,'' but insists that its tendency was to discredit the testimony of the expert physicians whom he had called. This objection is untenable, and the reasons which have been given answer contestant's exception to the court's refusal to give certain instructions proposed by him upon the subject of expert testimony.

Contestant's instructions which embodied his ''theory of the case'' were properly refused. The same objection obtains to these instructions that obtains to the hypothetical ques-

tions which were propounded,—that the evidence did not in vital respects tend to substantiate the theory. Again, these instructions were elaborately drawn and were in their nature a special argument addressed to the jury under the guise of instructions of law, and for this reason also were properly refused.

No other matters seem to call for particular consideration, though it may be added that, upon a review of all the instructions, the conclusion is irresistible that the jury was fairly and impartially advised.

Application for a writ of *supersedeas* pending the decision of this cause has been asked for. This decision renders more formal consideration of that application unnecessary. It is denied.

Appellant having died since the submission of this cause, it is ordered that the judgment and order appealed from be affirmed *nunc pro tunc* as of date of submission.

Lorigan, J., and McFarland, J., concurred.

Hearing in Bank denied.